A company of ThyssenKrupp Stainless **ThyssenKrupp Stainless USA**

**Contract N° 1034**

**STAINLESS MELT SHOP**

**Contents**

- Contract
- Annexes

1

MOSER SE CS P

**File 1/5**

SVAI MS Supply Contract – Final

Page 1

EXHIBIT 1

SIE_OTK_PAPER_0000001

**Contract Index**

| | | |
|---|---|---|
| 1 | DEFINITIONS AND INTERPRETATIONS | 6 |
| 2 | SCOPE OF CONTRACT AND GENERAL OBLIGATIONS OF THEPARTIES | 10 |
| 3 | COORDINATION OF THE OTHER CONTRACTORS | 19 |
| 4 | PROGRAMS AND PROGRESS REPORTING | 20 |
| 5 | CONTRACT PRICE | 21 |
| 6 | PAYMENT AND TERMS OF PAYMENT | 22 |
| 7 | DELIVERY AND TERMS OF DELIVERY | 26 |
| 8 | DELIVERY OF TECHNICAL DOCUMENTATION | 28 |
| 9 | PACKING AND MARKING | 29 |
| 10 | ENGINEERING AND ENGINEERING LIAISON | 30 |
| 11 | ENGINEER AND ENGINEER'S REPRESENTATIVE | 33 |
| 12 | ASSIGNMENT AND SUB-CONTRACTING | 35 |
| 13 | QUALITY ASSURANCE, INSPECTION AND TESTING | 38 |
| 15. | WARRANTIES AND REPRESENTATIONS | 43 |
| 16. | DEFAULT | 46 |
| 17 | LIABILITIES | 48 |
| 18 | CONSIDERATION FOR DELAY | 50 |
| 19 | INSURANCE | 55 |
| 20 | INTELLECTUAL PROPERTY | 59 |
| 21 | CONFIDENTIALITY | 60 |
| 22 | TAXES AND DUTIES | 61 |
| 23 | APPLICABLE LAW AND ARBITRATION | 64 |
| 24 | FORCE MAJEURE | 65 |
| 25 | NOTICES | 66 |
| 26. | TERMINATION FOR CONVENIENCE | 67 |
| 27. | VARIATIONS | 68 |
| 28. | MISCELLANEOUS | 70 |
| 29. | EFFECTIVENESS OF THE CONTRACT | 72 |

**Annexes List**

A1 Prices
A2 Contract Schedules
A3 Additional Contract Conditions
B Technical Specification
C Scope of Supply
D Standard Specifications
E Stainless Steel Products Specification
F Program and Progress Reporting
G Quality Assurance
H Packing, Marking and Shipping Requirements
I Occupational Health and Safety Requirements
J Technical Documentation Specification
K Specimens
K1 Advance Payment Guarantee

A company of ThyssenKrupp Stainless **ThyssenKrupp Stainless USA**

- K1A Interim Payment Guarantee for Technical Documentation and second Interim Payment Guarantee
- K2 Performance Guarantee
- K3 Warranty Guarantee
- K4 FIATA Warehouse Receipt
- K5 Letter of Comfort
- K6 Certificate of Acceptance

L Insurance
M Environmental requirements
N Foreign Trade Zone requirements
O Alabama Department of Revenue Sales and Use Tax Abatement Procedures
P Alabama General Contractor Licensing Rules

SVAI MS Supply Contract- Final Page 3

SIE_OTK_PAPER_0000003

Subject: Engineering, Manufacturing, Procurement, Supply, Supervision of Erection, Commissioning, Optimization, Training and Technical Documentation of a Stainless Melt Shop, consisting mainly of

One (1) Electric Arc Furnace (EAF)
one (1) Argon Oxygen Decarburisation Converter (AOD),
one (1) Continuous Caster (CCM) and
one ( 1 )Slab Grinding Plant (SGP)

and other components defined in detail in this Contract and its Annexes

inclusive electrical equipment as specified in detail in Annexes to this Contract,

**THIS CONTRACT** made on the **19th** day of May 2008, between

ThyssenKrupp Stainless USA, LLC, a company duly incorporated in the State of Delaware, United States of America and having its registered office at:

1087 Downtowner Boulevard
Mobile, AL 36609
United States of America

(hereinafter referred to as 'Buyer')

and

Siemens Energy & Automation, Inc.

a company duly incorporated in the State of Delaware and having its registered office at

3333 Old Milton Parkway
Alpharetta, GA 30005
United States of America

(hereinafter referred to as 'Seller')

(Buyer and Seller also referred to individually as "Party" and collectively as "Parties")

**WHEREAS** the Buyer undertakes to establish a new stainless steel processing plant located in vicinity of Mount Vernon, Alabama, United States of America (hereinafter referred to in this Contract and in the ANNEXES as the "Project", "Greenfield" and "New Star") and is desirous that certain work for the completion of the Project under the Contract should be undertaken by the Seller, as stated hereinafter, and,

**WHEREAS** the Seller states that it fully knows and understands the intended use and required functionality of the Project, and declares that it is fully qualified and possess the necessary approvals, knowledge, skills and experience with similar work, to render the services and to supply the goods subject to the terms of this Contract; and,

**WHEREAS** the Seller as a duly licensed general contractor in the State of Alabama to the extent required by Alabama law to perform any portion of the Work is interested to perform this Contract

**WHEREAS** the Buyer has accepted the tender by the Seller for the undertaking and completion of such work.

**NOW, THIS CONTRACT WITNESSETH** and the Parties hereto mutually agree as follows:

## 1 DEFINITIONS AND INTERPRETATIONS

### 1.1 DEFINITIONS

In construing the Contract the following words and expressions shall have the following meanings hereby assigned to them:

**"Acceptance Tests"** means the tests of each Equipment Unit for proof of the performance in accordance with the Performance Guarantees.

**"Buyer's Representative"** means any assistant or representative of the Buyer appointed from time to time to perform the duties delegated to him by the Buyer.

**"Certificate of Acceptance"** means a written confirmation issued by the Buyer after the Acceptance Tests of the respective Equipment Unit have been satisfactorily completed as required under this Contract and in accordance with the specimen attached as ANNEX K6.

**"Cold Commissioning"** means the functional tests of each Equipment Unit or defined single item of the Contract Equipment and of the entire Contract Equipment at the Construction Site without load and, to the extent specified in Annex B, all in accordance with the Contract.

**"Commissioning"** comprises both Cold Commissioning and Hot Commissioning.

**"Company"** means the Buyer for the purpose of this Contract

**"Company Representative"** means Engineer for the purpose of this Contract

**"Constructional Plant"** means appliances and things used on or in the vicinity of the Construction Site in the execution of the work under the Contract but not forming part of the Works.

**"Construction Site"** means the site for delivery, Erection, Commissioning, acceptance, operation and maintenance of the Contract Equipment, i.e. Mount Vernon, Alabama, USA.

**"Contract"** means this Contract and all ANNEXES hereto.

**"Contract Equipment"** means all equipment, machines, parts, components and/or spare parts supplied by the Seller and/or by the Buyer to form the complete Stainless Meltshop

**"Contract Price"** means the sum stated in the Contract as the price payable to the Seller by the Buyer for engineering, technical documentation, manufacture, Factory Acceptance Test, supply, supervision services and Commissioning of the Contract Equipment as laid down in Article 5 and ANNEX A 1 (Price Break-Down Schedule)

**"Date of Acceptance"** means the date stated in the relevant Certificate of Acceptance for the respective Equipment Unit.

**"Day"** means a calendar day unless specified otherwise in the Contract.

 **"Delivery"** means delivery in accordance with the delivery terms specified in this Contract and "deliver" and "delivered" shall have a corresponding meaning.

**"Effective Date"** means the date as defined in Article 29.5.

**"Engineer"** means the person appointed by the Buyer to act in the name and on behalf of the Buyer for the purposes of the Contract, and in lack of any appointment it means the Buyer.

**"Engineer's Representative"** means any assistant of the Engineer appointed from time to time to perform the duties delegated to him under this Contract.

**"Equipment Unit"** means individual components of the Contract Equipment notwithstanding if supplied by the Seller ( Seller´s Equipment) or by the Buyer ( Package Units ).

**"Erection"** means the erection and/or installation works of the Contract Equipment at the Construction Site including all works related to assembly, connecting and placing the Contract Equipment into its final position.

**"Factory Acceptance Tests"** means the tests specified in the Contract (or otherwise agreed by the Buyer and the Seller), which are to be made by the Seller upon completion of manufacture of Seller´s Equipment and in the Seller's or his Sub-contractor's workshops.

**"First Heat"** means that 1 (one) heat has been successfully produced through EAF, AOD and CCM

**"Hot Commissioning"** means the technical tests of the Contract Equipment with load at the Construction Site in accordance with the Contract.

**"Hot Commissioning Completion Certificate"** means a written confirmation issued by the Buyer after the completion of Hot Commissioning confirming that 6 heats have been produced within 12 hours within one ( 1 ) day as required under this Contract further stipulated in ANNEX C

**"Import Portion of the Contract Equipment"** means all Contract Equipment imported into United States of America from other countries.

**"Inspection"** means

- Inspections of manufacturing progress and for quality control in Seller's and Seller's Sub-contractor's workshops,
- Inspections for forward release.

**"Intellectual Property"** means all patents, logos, copyright, trade marks, trade names, engineering, know how, confidential information and other industrial or intellectual property.

**"Intellectual Property Items"** means all documents, drawings, materials, programs, systems, procedures, processes, formulae, methods of production, inventions, software, or other discoveries made or produced

by the Parties, which contain Intellectual Property in connection with this Contract.

**"Laws"** means treaties, statutes, statutory instructions, governmental orders, laws, by-laws, decrees, ordinances, directives, regulations, rules, circulars, judgements, injunctions, decisions and the like of any national, regional, state or local government, administrative or agency having jurisdiction with regard to the Work, or all or any portion of the Work or the Project.

**"Local Portion of the Contract Equipment"** means all Contract Equipment manufactured in the United States of America.

**"Month"** means Gregorian Calendar month.

**"Optimization"** means the tuning of the Contract Equipment as well as increase of nominal output such that the Contract Equipment operates according to the Performance Guarantees.

**"Optimization Phase"** means the period from the completion of Hot Commissioning until Acceptance Tests have been successfully completed.

**"Other Contractor"** means a contractor nominated as an Other Contractor by the Engineer

**"Overall Process Equipment"** means total mechanical and electrical equipment as specified under this Contract and other equipment to be built on the Construction Site.

**"Package Units"** mean Equipment Units supplied by the Buyer for which the Seller provides certain services as per this Contract and its Annexes

**"Performance Guarantees"** for the Contract Equipment are defined in ANNEX B.

**"Program"** and **"Contract Program"** means the program referred to in this Contract and its ANNEXES. It shall include the requirements of the contractual time schedule set forth in ANNEX A2.

**"Seller´s Equipment "** means the Equipment Units supplied by the Seller

**"Seller's Representative"** means the project manager of the Seller appointed from time to time to perform the duties delegated to him by the Seller.

**"Sub-contractor"** or **"Sub-supplier"** means any person (other than the Seller) used by the Seller for the supply of any part of Seller´s Equipment or any person to whom any part of the Contract has been sub-let by the Seller and the Sub-contractor's legal successors in title, but not any assignee of the Sub-contractor.

**"Supervision Services"** means the supervision rendered by the Seller during Erection, Commissioning and the Optimization Phase.

**"Technical Documentation"** means all data, information, designs, drawings, diagrams, documents and manuals required under the

 Contract and specified in ANNEXES D and J, which are necessary for Commissioning, operation, maintenance and repair of the Contract Equipment and for the training of the Buyer's operational and maintenance personnel. With respect to the Erection of the Contract Equipment the technical documentation shall comprise only such as listed in ANNEX J.

**"Technical Specification"** means the specification of the Equipment Units set forth in ANNEX B.

**"Variation"** means a variation or modification as may be made in accordance with Art. 27 hereunder or in the ANNEXES.

**"Week"** means any period of seven (7) days.

**"Work"** means a part or the whole work to be executed by the Seller in accordance with the Contract, including any variations provided for by the Contract, which by the Contract is to be handed over to the Buyer.

### 1.2 INTERPRETATIONS

Words referring to persons or parties shall include firms, corporations and any organization having legal capacity where the context requires.

Words in singular also include the plural and vice versa where the context requires.

When Seller is mentioned it includes its Sub-contractors , except if expressly stated otherwise.

## 2 SCOPE OF CONTRACT AND GENERAL OBLIGATIONS OF THE PARTIES

### 2.1 SCOPE OF CONTRACT

The Seller shall supply and/or provide to the Buyer the engineering, manufacturing, fabrication and/or procurement of such parts of the EAF, AOD, CC and SGP as laid down in detail in ANNEX B as Contractor's Scope of Work (Seller's Equipment), including the supervision of Erection, Commissioning and Optimization of Contract Equipment, Technical Documentation and the training of the Buyer's personnel as stipulated under the Contract.

The Seller shall carry out all Work necessary to hand over the Contract Equipment to the Buyer in a finished state suitable for the specified use as stipulated in accordance with the Contract and as laid out in ANNEX B.

All items of accessory, fitting, sundry apparatus and labor whether specified in detail or not in ANNEXES B and C as Seller's Scope of Work which are necessary for the contractual completion of the Works, are part of Seller's scope of the Contract.

The Parties herewith agree and fully recognize that the supplies and services to be performed under the Contract do not include, constitute nor consider any type of communication or information relative to industrial, commercial or scientific experience, knowledge or technology transfer.

### 2.2 OBLIGATIONS OF THE SELLER

#### 2.2.1 General

a) The Seller shall supply all goods, materials and services as specified as Seller's scope of Work in this Contract and its ANNEXES being directly necessary in order to achieve the performance of the Contract Equipment in line with the quality and performance specifications of the Contract.

b) The Seller is responsible for checking the plausibility of the Contract documents provided by the Buyer and also other relevant documents and any information obtainable by the making of reasonable inquiries to determine the risk, timing and cost in the performance of the Work, including safety requirements at the Construction Site. The Buyer shall however remain liable for the correctness and accuracy of the Contract documents and any information provided to the Seller.

c) The Seller shall be deemed to have visually inspected and familiarized itself with the Construction Site and its surroundings.

The Construction Site may be inspected by third parties only after approval by the Buyer.

d) The Seller shall base the execution of this Contract on the data with respect to climatic, hydrological, soil and general conditions at the Construction Site as specified in ANNEX B.

e) The Seller is responsible for complying with the relevant codes, standards and regulations applicable at the Construction Site. The Seller shall be deemed to have examined such Laws, codes, standards and regulations. The Seller shall be responsible to obtain and maintain all permits, licenses and authorizations necessary for the execution of the Work unless specified as the Buyer's obligations pursuant to Article 2.3. Without limiting the foregoing, in the event Seller is performing any installation Work at the Construction Site, Seller warrants that it is duly licensed as a general contractor in the State of Alabama to the extent required by Alabama law to perform any portion of the Work. Furthermore, the Seller warrants that its Sub-contractors will be duly licensed as sub-contractors in the State of Alabama to the extent required by Alabama law, should it be necessary to perform their contractual obligations.

f) The Seller shall perform, subject to the provisions of this Contract, with due care and diligence, the engineering, manufacturing, fabrication, shipment, delivery, supervision of Erection, Commissioning and Optimization of the Contract Equipment within the Contract Program.

g) The Seller shall submit to the Engineer the schedule of activities and the procurement schedule as set forth in ANNEX F.

h) The Seller shall be responsible for the care of Seller´s Equipment until FOB/FCA delivery. In the event that any part of Seller´s Equipment shall suffer loss or damage while the Seller has responsibility for the care thereof, the same shall be repaired or replaced by the Seller.

i) The Seller shall make good any defects in Seller´s Equipment during the warranty period for which the Seller is responsible as laid down in this Contract and in Article 15 in particular.

j) The Seller shall within fifteen (15) days after the Effective Date inform the Engineer in writing of the name of the Seller's Representative and other key personnel and of any subsequent changes. The Seller shall withdraw the Seller's Representative or its key personnel for important reasons only.

If the Engineer makes a reasonable objection to the appointment of the Seller's Representative or any other key personnel, based on misconduct or incompetence, the Seller shall terminate the appointment and appoint another Seller's Representative or key personnel.

k) Matters within the knowledge of a Seller's Representative shall be deemed to be within the knowledge of the Seller.

Any written direction of the Engineer shall be deemed to have been received by the Seller

If it relates to the execution of Work at the Construction Site and is given to the Seller's Representative on the Construction Site; or

If it relates to the execution of Work at any other place and is given to the Seller's Representative at the other place;

l) In the event that the Seller intends to sub-contract services or supplies under the Contract, the Seller shall consider in its inquiries ThyssenKrupp affiliated companies. If required by the Seller, the Buyer shall provide the Seller with the names and contact details of such companies. The Seller shall use reasonable efforts to consider such companies, provided that they are competitive. In addition, the Seller shall use reasonable efforts to consider competitive companies based in the State of Alabama,

**2.2.2 Manufacture and Engineering**

The Seller shall be responsible for Seller´s-Equipment-related engineering, detail engineering, planning, engineering and manufacture and supply, as specified under the Contract .

All supplies and services shall be in conformity with the state of art as incorporated in ANNEXES B and D as of the Effective Date. Technical innovations that become known to the Seller after the above date and during its implementation and continuing operation for a maximum period of ten (10) years shall forthwith be communicated to the Buyer unless the Seller is restricted by confidentiality obligations to third parties.

The Seller shall comply with the technical standards specified in ANNEX B unless prohibited by any mandatory Laws. In this case the Seller has to meet the standards required under these Laws and the Seller shall bring to the notice of the Buyer any conflict or contradiction arising from the requirements of this provision to find an amicable solution.

**2.2.3 Erection**

Seller shall verify the position of the mounting points on the foundations for Seller´s Equipment prior to the start of Erection. Seller shall as well advise the placing of anchor bolts for Seller´s Equipment in the foundations.

The Erection shall be carried out by the Buyer, or its assignee under the Supervision of the Seller in accordance with ANNEXES B and C

The Seller shall superintend the execution of the Work, especially of the Erection of Seller´s Equipment according to ANNEXES B and C and have a competent representative present on the Construction Site and, if reasonably required by the Engineer, have a competent representative present at other places at which activities relating to the execution of the Work are taking place.

 During the supervision of Erection, the Seller shall comply with:

a) The Construction Site management requirements and procedures of the Contract as provided to Seller in writing;

b) The Engineer's site management instructions;

c) Security arrangements the Buyer will establish for the Construction Site, including identification of persons entering the Construction Site;

d) All applicable Laws affecting health, safety, the environment, or operations on the Construction Site; and

e) The Construction Site safety rules as stipulated by the Buyer. These will be based on the principles established in ANNEX I "Occupational Health and Safety Requirements".

The Seller shall further maintain the relevant licenses and other permits as required for Seller by the Laws including license to work as general contractor in the State of Alabama. The basic information on Alabama General Contractor License is laid down in ANNEX P.

During the execution of the services under this Contract the Seller's shall comply with all rules and regulations of the Occupational Safety and Health Administration ("OSHA"), for the Seller's scope of Work.

**2.2.4 Commissioning, Optimization**

a) Responsibility of the Seller for Commissioning includes responsibility for Cold and Hot Commissioning and Optimization of the Contract Equipment for each Equipment Unit. The Contract Equipment will be operated by the Buyer's personnel under supervision by the Seller until all Acceptance Tests of that Equipment Unit have been performed successfully.

b) Further, for parts of Equipment Units not delivered by the Seller, the Seller shall participate in the Hot Commissioning of such Equipment Units by providing additional supervision services to those of the supplier of such equipment.

**2.2.5 Documentation**

The Seller shall prepare and supply the respective complete technical and operational documentation for Seller's Equipment in form of manuals for Commissioning, training, operation, maintenance and repair in accordance with Article 8 and as generally stipulated in the Contract.

**2.2.6 Training**

The Seller shall provide training and instruction of operating staff of the Buyer before and during operation, maintenance and repair, in such a manner and with the aim that the Buyer's qualified operating staff is able to operate the Contract Equipment independently and properly in accordance with ANNEXES B and C. The production and/or processing know-how is to be provided by the Buyer.

 **2.2.7 Protection of the Seller´s Equipment**

The Seller shall supply packing, painting, preservation and protection of Seller´s Equipment as required by the Contract to ensure that no damage or loss will occur during transportation to Construction Site and storage in accordance with ANNEX H.

**2.2.8 Transportation and Customs Clearance**

2.2.8.1 General

The Seller shall be responsible for exporting of the Import Portion of Seller´s Equipment out of the country of manufacture.

In case of unforeseeable obstructions hindering transport for more than three (3) days, the Parties will discuss and mutually agree upon adequate solutions.

2.2.8.2 Hazardous Materials

Before and at the time Seller´s Equipment is shipped, Seller will give Buyer sufficient warning in writing (including appropriate labels on all Seller´s Equipment, containers, and packing, including without limitation disposal and recycling instructions, material safety data sheets and certificates of analysis) of any hazardous or restricted material as per the Laws, that is an ingredient or part of Seller´s Equipment, together with any special handling instructions that are needed to advise carriers, Buyer, and their employees how to take appropriate measures while handling, transporting, processing, using or disposing of it or its containers and packing.

In any case, the Seller will be liable for any consequences that might derive from Seller's non-compliance with the Laws included but not limited to, the transport, handling, import or any other issues related to hazardous or restricted materials.

2.2.8.3 Country of Origin

Seller agrees to fulfill any customs related obligations, origin marking or labeling requirements, and local content origin requirements, including the country of origin requirements of the North American Free Trade Agreement and any other duty preference programs, and to provide to Buyer all documentation and information related to such requirements. If Seller´s Equipment is manufactured in a country other than the United States of America, Seller will mark Seller´s Equipment "Made in [country of origin]". In accordance with U.S. Customs Law, markings shall be permanent as the nature of the product will permit and located in a conspicuous place, easily available to U.S. Customs inspection upon arrival in the United States. If Seller´s Equipment is of a nature whereby marking is impossible, a securely affixed tag with country of origin named shall suffice.

2.2.8.4 Import/Export

 Seller shall comply with all Laws related to export of Seller´s Equipment and with the requirements of any export and import licenses. Upon Buyer's request Seller will promptly advise Buyer of any material or components imported into the country of origin and any duty included in the Contract Price. Seller will provide to Buyer and the appropriate governmental agency the documentation necessary to determine the admissibility and the effect of entry of Seller´s Equipment into the United States. Seller warrants that any information that is supplied to Buyer about the import and export of Seller´s Equipment is true and that all purchases covered by the Contract will be made at not less than fair value under the anti-dumping laws of the United States.

The Buyer intends to obtain the designation of the Construction Site as a Foreign-Trade Zone Subzone (FTZ). A FTZ can provide benefits during the Erection of the Contract Equipment. The importer can opt for the most favorable tariff classification and defer duty payments till the mass production starts. On the other side FTZ requirements must be observed strictly. The Buyer shall keep the Seller informed whether and when an application for a Foreign-Trade Zone Subzone was effectively filed and about the final decision of the competent authority. In case the FTZ is established:

The Seller agrees to coordinate with the Buyer whether possible FTZ benefits regarding the importation of Seller´s Equipment shall be realized by a FTZ activation of relevant parts of the Construction Site with US Bureau of Customs and Border Protection (CBP). Seller and Buyer shall then share all FTZ benefits and observe all FTZ requirements.

**2.2.9 Spare Parts**

The Seller will supply spare parts for Commissioning and operation of the Seller´s Equipment with prices shown in the ANNEX A 1 as further defined in this Contract, especially in ANNEX C.

The detailed list of such spare parts will be agreed between the Parties during the detail engineering process, latest until the last liaison meeting.

**2.2.10 Co-ordination with Sub-contractors and cooperation with other suppliers and contractors**

The Seller shall coordinate the Work with his Sub-contactors and cooperate with the Other Contractors appointed by the Buyer which are executing work related to or relevant for Seller´s Equipment, to ensure that the Work is correctly and timely executed and all interfaces are properly accounted for. Buyer shall require its Other Contractors to cooperate with Seller to the same extent.

**2.2.11 Laws and –Standards**

The Contract Equipment shall meet the relevant Laws and standards in force and applicable in the United States of America and the State of Alabama and the county of the Construction Site, with respect to particularly, but not limited to, prevention of accidents, environmental requirements (as described but not limited to in ANNEX M) and other safety regulations.

 In case certain standards do not exist in United States of America or at the Construction Site, such standards which are in force or are common practice at the date of Contract signature in Germany shall be complied with, to the extent they do not violate mandatory US laws.

The Seller shall comply with the occupational, health, safety and environmental laws and regulations in use at, or associated with Work at the Construction Site and in particular will comply with (i) the specific requirements and instructions of the Engineer, (ii) as specified in ANNEX B, (iii) the requirements set forth in ANNEX M and (iv) the requirements of this Contract.

The Parties shall observe changes of Laws and standards mentioned in this Article 2.2.11. With regard to changes of Laws, Standards including but not limited to the Occupational Safety and Health and Environmental Laws, the reference date is the date of signing of the Contract. After this reference date, the Parties shall inform each other without undue delay about any changes, which may have a material impact on Seller's Equipment. Both parties shall always observe the relevant Laws and changes thereto. In case and to the extent the Seller suffers any delay and/or incurs any additional cost in complying with such changes, the Seller shall be entitled to a corresponding extension of the Program, including the time for completion of all subsequent Milestones and/or to be reimbursed by the Buyer for any such cost so incurred. The same principle shall apply to the benefit of the Buyer in case of cost and/or time savings due to such changes.

**2.2.12 Execution of the Seller's obligations by the Buyer**

If the Seller fails to comply with its obligations under this Contract and does not remedy such non compliance within a reasonable period of time after receipt of Buyer's notification, the Buyer may in addition to any other remedy, perform the obligation on the Seller's behalf and the direct cost incurred by the Buyer shall be a due debt from the Seller to the Buyer.

**2.2.13 Labor Matters**

The Seller will hire, under his exclusive responsibility, direction and dependence, the necessary personnel or Sub-contractors to accomplish the Work, in the understanding that all the Sub-contractors or personnel hired by the Seller or Sub-contractors will be deemed as their employees and that no employee-employer relationship will exist between the Seller's and Sub-contractors' employees and the Buyer. Nevertheless, all said personnel present at the Construction Site shall act at all times and in compliance with the Buyer's regulations as made known in advance to Seller.

Unless caused by the Buyer, Buyer's personnel, agents or Buyer's other subcontractors or contractors the Seller agrees to indemnify and hold the Buyer harmless with respect to labor matters from and against any and all third party claims, demands, losses, costs, expenses, obligations, liabilities, actions, suits, damages to tangible property or injuries to

persons, including death, sustained by the Seller's and/or Sub-contractors' employees, or agents' employees, and all amounts paid in settlement of any such claims which may derive from any labor matter regarding the Seller's employees.
Likewise, it is the responsibility of the Seller to:

a) Provide proper insurance protection for its employees, Sub-contractors' employees, agents' employees or personnel as described in detail in Article 19; so these shall be entitled to receive the benefits provided under this insurance; and,

b) To get in advance any work visa or other migratory document required by any of his employees, personnel or Sub-contractors.

c) Comply with the applicable Laws at the Construction Site related to labor matters.

**2.2.14 <u>Environmental Requirements</u>**

The Contract Equipment shall fully comply with the environmental requirements for its operation as per the Laws and as specified in ANNEXES B and M.

While performing Work at or near the Construction Site, Seller shall comply with all applicable Laws for the protection of public health and the environment, as well as Seller's solid waste and hazardous waste disposal procedures as provided in the Contract, including but not limited to the requirements set forth in ANNEX M (hereinafter referred to as the "Environmental Requirements", as defined in said ANNEX).

**2.3 OBLIGATIONS OF THE BUYER**

2.3.1 The Buyer will provide in accordance with the Contract Program the following goods and/or services as far as not otherwise stipulated in the Contract:

- Items of equipment, engineering and services belonging to the individual diverse Equipment Unit and defined in detail in ANNEX B.
- Provisions and preparation of the Construction Site in a suitable and safe and unobstructed condition as far as possible or feasible (both subsurface and surface).
- Civil works including piling (if necessary), process and electrical room buildings for the equipment (including foundations).
- Import process and customs clearance.
- Erection of the Contract Equipment.
- Space for the Seller to establish his site facilities.
- Operators and materials of sufficient quantity and quality to operate the Contract Equipment under the direction and supervision of the Seller during the Erection, Commissioning and Optimization phase.
- Required Services, equipment, materials, utilities and other work, materials and services as specified in ANNEXES B and C.

A company of ThyssenKrupp Stainless ThyssenKrupp Stainless USA

- Obtaining of the approvals and permits of authorities in the United States of America for the Erection, Commissioning and operation of the Contract Equipment. as specified in ANNEX A3. The Seller shall assist the Buyer in obtaining these approvals and permits by providing necessary information and documentation as reasonably requested by the Buyer.

2.3.2 The Buyer will inform the Seller about all changes of Laws mentioned in Article 2.2.11 which come to his attention. Failure of Buyer to so notify Seller shall neither release Seller from any obligations under this Contract nor from compliance with such changes.

SVAI MS Supply Contract- Final Page 18

SIE_OTK_PAPER_0000018

## 3 COORDINATION OF THE OTHER CONTRACTORS

3.1 The Seller shall provide coordination services for certain parts of Equipment Units to be provided by the Buyer described as " Package Unit Category C" in ANNEXES B and C during design, manufacture, shop assembly, delivery, Erection and Commissioning of the Equipment Units as follows.

3.2 Where the Work under this Contract requires cooperation, integration or interface activity then the Seller shall inform and liaise with the Buyer and shall cooperate and interface with Other Contractors.

3.3 Where the Seller perceives a potential or real conflict between the Work under this Contract and the works of Other Contracts then the Seller shall, after consultation with the Other Contractors advise the Engineer in writing with a recommendation for resolution of the issue.

3.4 For the common sake of facilitating the progress of works, the Seller is requested to report to the Engineer any deficiencies in the work of Other Contractors which reasonably should come to his knowledge and technical concerns that would affect the work under this Contract.

3.5 Buyer will make available to Seller documents and information about the supplies and services reasonably required by the Seller to carry out its co-ordination tasks.

3.6 The Buyer will oblige all Other Contractors to observe and comply with the instructions given by the Seller.

4 PROGRAMS AND PROGRESS REPORTING

4.1 The Seller shall prepare schedules, programs and progress reporting data as provided for in ANNEXES A2, B and F. For this reporting the MS-Project software shall be used.

4.2 The Seller shall not make any material alteration to the Contract Program without the Engineer's consent, which shall not be unreasonably withheld, and such consent shall not constitute an approval of an extension of time under the Contract unless specifically advised to the Seller by the Engineer.

4.3 If the Engineer in his reasonable opinion decides that progress of the Seller under this Contract does not match the Contract Program, he shall be entitled to order the Seller in writing to revise the Contract Program. The Seller shall thereafter revise the Contract Program to show the modifications necessary to ensure the completion of the milestones at the dates specified in the Schedule of Milestones as per ANNEX A2. Any such revision of program shall not constitute an approval of an extension of time under the Contract unless specifically advised to the Seller of such extension of time by the Engineer such extension shall not be unreasonably withheld.

4.4 The Engineer shall be entitled to notify the Seller if he reasonably considers that progress of the Seller under the Contract does not match the Contract Program. Following receipt of such a notice the Seller shall take such steps as may be necessary to remedy or mitigate the likely delay, including revision of the Program. Subject to Article 4.5, the Seller shall not be entitled to any additional payment for taking such steps.

4.5 The Seller shall inform the Engineer in writing as soon as he is aware of any circumstance, whether in Seller's control or not, which may cause a delay in the performance of the Work, and propose measures to minimize or overcome the delay. In case that the delay is not attributable to the Seller, the Seller shall be entitled to be paid for the proven additional costs.

**5 CONTRACT PRICE**

5.1 The Contract Price is firm and fixed and binding with the exception of any Variations. The Contract Price is inclusive of the whole of the Seller's scope of Work described in this Contract, all necessary services and other incidentals associated with or necessary for the execution of the Seller's scope of Work described, and for the performance of the obligations of the Seller under this Contract.

5.2 The Contract Price is:

**USD 133,561,811.00**

(in words: USD one hundred thirty- three million five hundred sixty-one thousand eight hundred eleven 00/100 )

and is based on the terms and conditions stipulated under this Contract.

5.3 The break-down of the Contract Price is laid down in ANNEX A 1.

## 6 PAYMENT AND TERMS OF PAYMENT

**6.1** Payments will be deemed effected upon being credited to the Seller's account without deductions. All payments shall be made in accordance with the conditions stated hereunder. All payments under this Contract will be effected within thirty (30) days after receipt by the Buyer of all the respective documents.

**6.2 TERMS OF PAYMENT**

The Contract Price shall be paid in accordance with the following conditions and proportions:

6.2.1 Advance Payment

An Advance Payment in the amount of USD 23,313,362.00, which amount represents twenty (20) % of the price for the total Contract Price excluding the price for supervision, training and commissioning services as per ANNEX A1 minus the amount of USD 719,000.00 (in words: seven hundred nineteen thousand U.S. DOLLARS) already paid to the Seller according to the pre-contractual agreement dated April 10, 2008, shall be paid by the Buyer to the Seller within thirty (30) days after receipt of the following documents:

a) Pro-forma Invoice (one original and three copies) covering one hundred (100) % of the total Contract Price excluding the price for supervision, training and commissioning services;

b) One (1) original and three (3) copies of Seller's commercial invoice covering twenty (20) % of the total Contract Price excluding the price for supervision, training and commissioning services minus the amount of USD 719,000.00 (in words: seven hundred nineteen thousand U.S. DOLLARS) already paid to the Seller according to the pre-contractual agreement dated April 10, 2008;

c) Advance Payment Guarantee in the amount of USD 24,032,362.00 which amount represents twenty (20) % of the price for the total Contract Price excluding the price for supervision, training and commissioning services, in accordance with the specimen enclosed in ANNEX K1 to this Contract;

d) Performance Guarantee in the amount of USD 13,356,181.00, which amount represents ten percent (10%) of the Contract Price in accordance with the specimen enclosed in ANNEX K2 to this Contract.

6.2.2 Payment against delivery of Technical Documentation

A total amount of USD 6,008,091.00 which amount represents five percent (5%) of the price for the total Contract Price excluding the price for supervision, training and commissioning services (as per ANNEX A 1, Price Break-Down Schedule) shall be paid by the Buyer once all of the Technical Documentation TD 101, TD 102 and TD in ANNEX A2 Part 3

 has been delivered to the Buyer and against presentation of the following documents:

a) One (1) original and three (3) copies of Seller's commercial invoice showing the five percent (5%) of the price for the total Contract Price excluding the price for supervision, training and commissioning services and

b) A written statement duly signed by the Seller (one original and three copies) stating that the marked Technical Documentation as per 6.2.2 has been delivered.

c) Interim Payment Guarantee for Technical Documentation in the amount of USD 6,008,091.00, which amount represents five percent (5%) of the price for the total Contract Price excluding the price for supervision, training and commissioning services, in accordance with the specimen enclosed in ANNEX K1A to this Contract;

6.2.3 Interim Payment

An Interim Payment in the amount of USD 6,008,091.00, which amount represents five percent (5%) of the price for the total Contract Price excluding the price for supervision, training and commissioning services shall be paid by the Buyer to the Seller within thirty (30) days after the after the end of the 10th month after the Effective Date of the Contract and after receipt of the following documents:

a) One (1) original and three (3) copies of Seller's commercial invoice covering five percent (5%) of the total Contract Price excluding the price for supervision, training and commissioning services;

b) Interim Payment Guarantee in the amount of USD 6,008,091.00, which amount represents five percent (5%) of the price for the total Contract Price excluding the price for supervision, training and commissioning services, in accordance with the specimen enclosed in ANNEX K1A to this Contract;

6.2.4 Payments against delivery of Seller´s Equipment, First Heat and Acceptance

6.2.4.1 An amount of USD 66,088,996.00, which amount represents fifty-five percent (55%) of the price for the total Contract Price excluding the price for supervision, training and commissioning services shall be paid pro-rata shipment / delivery against presentation of the following documents:

a) One (1) original and three (3) copies of Seller's commercial invoice showing Seller´s Equipment or part thereof, description, quantity, unit price, total amount and Contract Number; and,

b) One (1) original and three (3) copies of the quality certificate(s) issued by the manufacturer(s) of the Seller or Seller's own workshop(s) and signed by the Seller or Seller's representative; and,

c) If applicable, all the relevant documentation which proves that the imported Seller´s Equipment has been imported into the U.S.A.; and,

d) One (1) original and three (3) copies of one of the original of packing list identifying contents of each package; and,

e) One (1) original and three (3) copies of the negotiable bill of lading.

or

In case of warehousing against presentation of one (1) original and three (3) copies of FIATA Warehouse Receipt or storage receipt in accordance with the specimen enclosed in ANNEX K4 and one (1) copy of a written permission to store the equipment signed by the Buyer.

6.2.4.2 An amount of USD 12,016,181.00, which amount represents ten (10) % of the price for the total Contract Price excluding the price for supervision, training and commissioning services shall be paid against presentation of following documents:

a) One (1) original and three (3) copies of Seller's commercial invoice(s), and

b) One (1) copy of the First Heat protocol countersigned by the Buyer.

6.2.4.3 An amount of USD 6,008,090.00, which amount represents five percent (5%) of the price for the total Contract Price excluding the price for supervision, training and commissioning services shall be paid against presentation of following documents:

a) One (1) original and three (3) copies of Seller's commercial invoice(s), and

b) One (1) copy of the original Certificate of Acceptance signed by the Buyer, and

c) Warranty Guarantee for ten (10) % of the Contract Price, which equals an amount of USD 12,016,181.00 in accordance with the specimen enclosed in ANNEX K3. After the completion of the Performance Campaign this Warranty Guarantee will be reduced to five ( 5 ) % of the Contract Price.

6.2.5 Payment for Commissioning, Supervision Services and Training

An amount of USD 13,400,000.00 which amount represents one hundred (100) % of the price for Commissioning, Supervision Services and Training shall be paid in monthly rates pro rata progress against presentation of following documents:

 One (1) original and three (3) copies of Seller's commercial invoice in accordance with the respective Certificate of Payment based on timesheets presented by Seller and countersigned by the Buyer.

6.3 General

All commercial invoices shall comply with the fiscal regulations and/or requirements prevailing at the Construction Site.

The Buyer shall provide the Seller with a Letter of Comfort in accordance with the specimen included as ANNEX K5.

All payment securities in form of Corporate Guarantee as per this Article 6 shall be issued by Siemens Corporation, in accordance with the wordings in ANNEXES K1 - 3. The Advance Payment Guarantee of twenty (20%) and the two Interim Payment Guarantees of each five percent (5%) shall be reduced pro-rata delivery, the Performance Guarantee of ten (10%) shall be valid until four (4) weeks after the contractual scheduled time for acceptance and the Warranty Guarantee will be valid until expiration of the warranty period and free of charge to the Buyer. This Warranty Guarantee will be reduced to five ( 5 ) % once the Productivity Campaign according to Art. 15.16 has been carried out and a report, analysis and an action plan, if any, will have been agreed upon by the Parties.

All bank charges except the charges of Seller's bank will be borne by the Buyer. Seller will bear the charges of his bank.

Payments for the respective instalments shall in each case be effected within thirty (30) days from the receipt of the agreed documents by the Buyer.

All payments shall be deemed to have been effected when and as far as the amounts have been credited in full in USD to the bank account of the Seller without any restriction.

In the event the Buyer delays due payments for reasons not attributable to the Seller for more than 6 weeks, the Seller has the right to suspend the execution of the Work until the due payment is effected.

7 DELIVERY AND TERMS OF DELIVERY

7.1 The Seller shall deliver Seller's Equipment and the Technical Documentation on the basis FOB any seaport nominated by the Seller considering effective trade restrictions in the United States of America or FCA point of shipment for deliveries from the NAFTA-countries according to the latest revision of INCOTERMS 2000 (ICC 2000).

7.2 Seller's Equipment with the exception of Technical Documentation shall have a total net weight of approximately 4700 metric tons.

7.3 The Seller shall complete the delivery of Seller's Equipment in accordance with the Contract Program laid down in ANNEX A 2.

7.4 The Seller shall notify in writing to the Buyer readiness for shipment of Seller's Equipment or any part thereof three (3) weeks prior to that date. In case of delay of any shipment having major impact on long term shipping arrangements the Parties shall consult with the aim to find a warehouse.

7.5 Necessary shipping documents shall be delivered as detailed in ANNEX H of this Contract.

7.5.a) The title of ownership of any part of the equipment will pass from the Seller to the Buyer upon FOB / FCA delivery.

7.5.b) NOT USED.

7.6 The Seller shall supply the software, spare parts, consumable parts and wear and tear parts as well as special tools and other equipment as specified under the Contract for the timely Commissioning of the Seller's Equipment.

7.7 If the Seller, subject to the written agreement of the Engineer, borrows for Commissioning or Optimization of Seller's Equipment spare parts from the Buyer, the Seller shall replace those parts to the Buyer without undue delay.

7.8 In case the Seller has Seller's Equipment or part thereof ready for delivery in accordance with the Contract Program and the Buyer requests the Seller to postpone the shipment for more than thirty (30) days, the Parties agree upon the following procedure:

- The Buyer shall inform the Seller without undue delay as to whether the relevant equipment should be stored at a warehouse facility within the Buyer's organization or any other warehouse able to issue a FIATA warehouse receipt.
- In case the Buyer has chosen to have the relevant equipment stored at a facility within the Buyer's organization, the Buyer shall arrange for a storage receipt in favor of the Seller, to be handed over to the Seller upon deposit of such equipment for release of payment.
- Upon the Buyer's request, the Seller is obliged to forward the stored equipment to the original point of delivery at the Seller's expense.

A company of ThyssenKrupp Stainless ThyssenKrupp Stainless USA

- All proven costs resulting from postponement of shipment over thirty (30) days at the Buyer's request made after readiness for shipment will be borne by the Buyer.

SVAI MS Supply Contract- Final Page 27

SIE_OTK_PAPER_0000027

## 8 DELIVERY OF TECHNICAL DOCUMENTATION

8.1 The Seller shall deliver to the Buyer the Technical Documentation to the Construction Site or to a place notified to Seller by the Buyer in compliance with the provisions and at times as set forth in ANNEXES A2 and B to the Contract.

8.2 Not used

8.3 Within two (2) working days after dispatching the Technical Documentation, the Seller shall, unless otherwise specified in ANNEX H, notify the Engineer by fax or email of the Contract No., Transport Agent or Courier Service, Airway Bill or Courier Bill No., the Technical Documentation list, number of parcels, weight, date of dispatch and destination.

8.4 The day of shipment as confirmed by transport or courier agent of the Technical Documentation shall be deemed as the actual date of delivery of the Technical Documentation.

8.5 Should any of the delivered Technical Documentation be found missing, damaged, incomplete or otherwise not conform with the requirements of this Contract, the Buyer shall advise the Seller immediately and the Seller shall redeliver the missing, damaged and incomplete documentation by courier service free of charge to the Buyer within a reasonable time after notification by the Buyer (as a rule to be dispatched not later than five (5) working days after receipt of notification).

A company of ThyssenKrupp Stainless ThyssenKrupp Stainless USA

## 9 PACKING AND MARKING

The Seller shall comply with the requirements set forth in ANNEX H in relation to the packing and marking of Seller's Equipment and Technical Documentation and shall observe any size, weight or handling limitations that may be applicable.

SVAI MS Supply Contract- Final Page 29

SIE_OTK_PAPER_0000029

## 10 ENGINEERING AND ENGINEERING LIAISON

10.1 The Seller shall carry out the engineering and engineering liaison meetings under this Contract (as stipulated in ANNEX A2 Part 2) to comply with the engineering and quality standards defined in this Contract. Such meetings will be carried out at the request of and at the location nominated by the Engineer.

10.2 After the Effective Date the Seller shall at his own cost take part in all engineering liaison meetings at the Buyer's office unless the Engineer nominates another location. During the liaison meetings the Engineer has the right to ask the Seller to make reasonable modifications to the engineering without in any way releasing the Seller from his responsibility under this Contract.

In case the Seller deems the Engineer's modification inappropriate, or with material effect on time and cost, he is obliged to raise his objections without undue delay, before incorporating the Engineer's modifications.

10.3 The Seller may propose reasonable modification(s) during the course of the engineering of Seller´s Equipment. These modifications at the Seller's own costs may be done on condition that the specifications, quantities, types, sizes and performance standards as stipulated in the ANNEXES hereto shall not be impaired or diminished and that the technical standards and the lifetime of Seller´s Equipment shall not be reduced.

The Seller shall inform the Engineer without delay of the details of such modification proposal. Any modification can be made only after the written consent by the Engineer without in any way releasing the Seller from his responsibility under this Contract.

10.4 The Seller shall be responsible for the basic and detail engineering of the Seller´s Equipment in accordance with the requirements of the Contract. Insofar as the Seller is required by the Contract or is instructed by the Engineer to comply with any detailed engineering provided by the Buyer or the Engineer, the Seller shall be responsible for the correct incorporation of such engineering unless within a reasonable period of time after receipt thereof he shall have given notice to the Engineer of any inadequacies, or time or cost impact, the Seller perceives in the engineering. If no such notice is given, the Seller shall be responsible for the overall engineering of the Seller´s Equipment.

10.5 Should the Seller's engineering be found erroneous or incomplete, the Seller shall correct the errors at no cost to the Buyer without delay.

10.6 The Seller shall submit to the Engineer for review:

a) within the timeframe laid down in the Contract Program and according to ANNEX A2, Technical Documentation Schedule, all drawings, and other technical data, or information (including calculations), in the scope and in the number of copies specified in the Contract (but in any case not less than two (2) );

 b) during the progress of the Contract, the documentation stipulated under ANNEXES A, B, F, G, H and I.

The Engineer shall communicate the result of his review in writing to the Seller. If he fails to do so within the time given in the Contract Program, or, if no time limit is specified, within fourteen (14) days of receipt, the drawings shall be deemed to be approved and the Seller can proceed on the basis of the drawings.

10.7 Subject to Article 10.2, any drawings, documents, specifications or other technical data, on which the Engineer provides comments or has requested modifications shall be modified by the Seller and returned to the Buyer without delay.

The Engineer shall have the right upon prior notice to inspect all drawings produced by the Seller or any Sub-contractor of any part of the Se4ller´s Equipment.

10.8 The Seller, in accordance with ANNEX A2, shall provide information required for e.g.:

- preparing suitable foundations or other means of support.

10.9 Within the time or times stated in the Contract and particularly in its ANNEXES or in the Program or Technical Documentation Schedule the Seller shall supply manuals for operating and maintenance and the corresponding assembly and sub-assembly drawings of Seller´s Equipment. The operating and maintenance manuals shall be in a comprehensive and functionally structured form that is required to allow comprehensive operation and maintenance of Seller´s Equipment and operation of the Contract Equipment during commissioning.

10.10 Drawings and information supplied by the Seller may be used by the Buyer only for the purposes of commissioning, completing, operating, maintaining, adjusting and repairing Seller´s Equipment. Commissioning shall not be executed without the presence of Seller's supervising personnel.

Drawings and information supplied by the Buyer to the Seller for the purpose of the Contract shall remain the property of the Buyer. They shall not, without the consent of the Buyer, be used, copied or communicated to a third party unless strictly necessary for the performing of this Contract.

10.11 Notwithstanding the review by the Engineer of drawings, technical data, specifications or information submitted by the Seller, the Seller shall be responsible for any errors, omissions or discrepancies therein unless they are due to incorrect drawings, technical data or information supplied by the Buyer or the Engineer and the Seller has notified the Engineer pursuant to Art. 10.4.

The Seller shall bear any costs he may incur as a result of delay in providing such drawings, technical data or information or as a result of errors, omissions or discrepancies therein.

A company of ThyssenKrupp Stainless ThyssenKrupp Stainless USA

The Seller shall at his own expense carry out any alterations or remedial work necessitated by Seller's errors, omissions or discrepancies and modify the drawings, technical data or information accordingly.

SVAI MS Supply Contract- Final Page 32

SIE_OTK_PAPER_0000032

 ## 11 ENGINEER AND ENGINEER'S REPRESENTATIVE

11.1 The Engineer shall carry out such duties in issuing certificates, decisions, instructions and orders as are specified in the Contract.

If the Engineer is required, under the terms of his appointment by the Buyer, to obtain the prior specific approval of the Buyer before exercising any of his duties under the Contract, particulars of such requirements will be given in a written notice from the Buyer to the Seller.

11.2 The Engineer's Representative shall be responsible to the Engineer and shall watch, supervise, test and examine any Seller´s Equipment or workmanship employed in connection therewith. The Engineer's Representative shall have only such further authority as may be delegated to him by the Engineer under this Article 11.

11.3 The Engineer may from time to time delegate to the Engineer's Representative any of his duties and he may at any time revoke such delegation.

Any delegation or revocation shall be in writing. The Engineer shall timely furnish to the Seller and to the Buyer a copy of any such delegation or revocation. No such delegation or revocation shall have effect until a copy thereof has been delivered to the Seller.

Any written decision, instruction, order or approval given by the Engineer's Representative to the Seller in accordance with such delegation shall have the same effect as though it had been given by the Engineer.

If the Seller disputes or questions any decision instruction or order of the Engineer's Representative he may refer the matter to the Engineer who shall confirm, reverse or vary the decision in accordance with Article 11.5.

11.4 An oral decision, instruction or order from the Engineer shall not be effective until written confirmation thereof has been received by the Seller from the Engineer. The Seller may require the Engineer to confirm in writing any decision, instruction or order of the Engineer, which is not in writing. The Seller shall make such request within two (2) working days.

11.5 If the Seller disputes or questions a decision, instruction or order of the Engineer he shall do so by giving written notice to the Engineer within 14 days after receiving such decision, instruction or order, specifying the reasons for so doing. The Engineer shall within a further period of 7 days after receipt of the Seller's notice give a written notice to the Seller and the Buyer with reasons, whereby he confirms, reverses or varies such decision, instruction or order.

If within a further period of seven (7) days either the Seller or the Buyer disagrees with such decision, instruction or order as confirmed, reversed or varied either party shall be at liberty to refer the matter to ThyssenKrupp Stainless AG, Duisburg to settle the matter through consultation between the parties. In case the differences between the parties cannot be settled, the matter under dispute may be referred to arbitration according to Article 23 of this Contract.

A company of ThyssenKrupp Stainless ThyssenKrupp Stainless USA

11.6 The Seller acknowledges that the Engineer may be an employee, servant, agent or representative of the Buyer or the Buyer's consultant.

The Engineer shall act in the interests of the Buyer in the exercise of the functions of the Engineer under this Contract.

The Buyer shall be responsible for acts, omissions, defaults of the Engineer as if they were Buyer's own acts, omissions or defaults.

SVAI MS Supply Contract- Final Page 34

SIE_OTK_PAPER_0000034

## 12 ASSIGNMENT AND SUB-CONTRACTING

**12.1** Assignment

The Seller shall not assign the benefit of the Contract in whole or in part or any of his obligations under the Contract. An assignment charge in favor of the Seller's Bankers of any monies due under the Contract, or the subrogation of insurers to the Seller's rights shall not be considered an assignment.

The Buyer has the right at any time upon its sole discretion to assign and transfer all its rights, obligations and benefits out of this Contract to another company belonging in its majority to the ThyssenKrupp AG, Düsseldorf, Federal Republic of Germany, group of companies. The Seller approves already now such assignment and transfer.

In case of such transfer the Seller shall upon written request by the Buyer issue new guarantees as per ANNEX K1 – 3 to the benefit of such other company for the still outstanding obligations according to the provisions of this Contract against return of the initial guarantees. The proven costs of the re-issuance of new guarantees will be reimbursed by the Buyer to the Seller.

The Letter of Comfort (ANNEX K 5) shall be adjusted by the Buyer accordingly.

The Parties agree that said transfer will be effective upon the exchange of the newly issued securities between the Parties.

**12.2** Sub-Contracting

The Seller shall not sub-contract part of the work under the Contract in contradiction to the Sub-contractor list in ANNEX A3 without the prior consent of the Engineer which shall not unreasonably be withheld.

The Seller shall be responsible for the acts, defaults and neglects of any of the Sub-contractor, his agents, servants or workmen as fully as if they were the acts, defaults or neglects of the Seller and/or his agents, servants or workmen.

Seller shall ensure that Sub-contractors comply with the provisions of the Contract, insofar as they apply to the sub-contracted Work or to the goods and materials to be supplied.

The Seller shall use reasonable efforts to consider services and supplies from companies based in the State of Alabama under competitive conditions.

12.3 **Minority-Owned, Woman-Owned, And Local-Owned Business Participation**

12.3.1 Seller acknowledges the importance to Buyer of using Minority-Owned Business Enterprises, Woman-Owned Business Enterprises, and Local-Owned Business Enterprises for the supply of work, labor, equipment, or services used in the performance of the Work.

12.3.2 Seller shall use commercially reasonable efforts to obtain bids or quotations from qualified Minority-Owned Business Enterprises, Woman-Owned Business Enterprises or qualified Local-Owned Business Enterprises ( i) for all Work that Seller intends to perform using Sub-contractors, and (ii) for all equipment, materials, and services that Seller purchases specifically for performance of the Work.

12.3.3. For goods and services planned to be procured in the United States of America, the Seller shall maintain a record of the Minority–Owned Business Enterprises, Woman-Owned Business Enterprises and Local-Owned Business Enterprises who are solicited for bids or quotations on the Project and shall verify for Buyer that such are qualified Minority-Owned Business Enterprises, Woman-Owned Business Enterprises or Local-Owned Business Enterprises

12.3.3 As with any Subcontractor, Buyer reserves the right to approve or disapprove the use of any potential Minority-Owned Business Enterprise, Woman-Owned Business Enterprise, or Local-Owned Business Enterprise as a Subcontractor, unless such Enterprise is already listed in the Technical Specification as a potential (preapproved) subcontractor/subvendor.

12.3.4 Nothing expressed or referred to in this Section will be construed to give any person or entity other than the Parties to this Contract any legal or equitable right, remedy, or claim under or with respect to this Section or any provision of this Contract. This Section and all of its provisions are for the sole and exclusive benefit of the Parties to this Contract and their successors and assigns.

12.3.5 As used herein, the terms below have the following meanings:

(a) "Minority-Owned Business Enterprise" means a minority-owned Subcontractor or supplier located in the United States of America and certified as a Minority Business Enterprise by a certifying agency approved by Buyer. The Alabama Department of Economic and Community Affairs, Office of Minority Business Enterprise, is an Buyer approved certifying agency. All other agencies are subject to Buyer's approval.

(b) "Woman-Owned Business Enterprise" means a Subcontractor or supplier located in the United States of America and that is at least 51% owned, controlled and operated on a day-to-day basis by one or more females who are U.S. citizens, and who is certified as such by a certifying agency approved by Buyer. The Alabama Department of Economic and Community Affairs, Office of Minority Business Enterprise, is an Buyer approved certifying agency. All other agencies are subject to Buyer's approval

(c) "Local-Owned Business Enterprise" means a Subcontractor or supplier located in the United States of America and that is at least 51% owned, controlled and operated by individuals who are

A company of ThyssenKrupp Stainless **ThyssenKrupp Stainless USA**

residents of the State of Alabama or whose principal place of business is located in the State of Alabama.

(d) "qualified" Minority-Owned, Woman-Owned or Local-Owned Business Enterprise means such business enterprise which has proven to the Seller by its past performance that it is technically and commercially competent and competitive.

SVAI MS Supply Contract- Final Page 37

SIE_OTK_PAPER_0000037

## 13 QUALITY ASSURANCE, INSPECTION AND TESTING

13.1 The Engineer shall at the Buyer's cost be entitled – after prior notice - at normal times to inspect, examine and test on the Seller's premises the materials and workmanship and performances of all Seller´s Equipment to be supplied under the Contract. If part of Seller´s Equipment is being manufactured on other premises the Seller shall obtain for the Engineer permission to inspect, examine and test as if Seller´s Equipment were being manufactured on the Seller's premises. Such inspection, examination or testing shall not release the Seller from any obligation under the Contract.

13.2 The Seller shall inform the Engineer the date on, and the place at which, Seller´s Equipment will be ready for the tests or inspection as provided in the Contract. The Seller shall provide the Engineer with adequate notice of his intention to perform tests. The Seller shall forthwith forward to the Engineer complete and duly signed copies of the inspection and test records as outlined in ANNEXES B and G.

13.3 The Seller shall provide free of charge such assistance, labor, materials, electricity, fuel, stores, apparatus and instruments as may be required and as may be reasonably requested and are available in the Seller's workshops to carry out the tests or inspection.

13.4 If after inspecting, examining or testing any Seller´s Equipment it is verified that such Seller´s Equipment or any part thereof is defective or not in accordance with the Contract, the Engineer may reject the said Seller´s Equipment or part thereof by giving to the Seller as soon as reasonably practicable notice of such rejection, stating therein the reasons upon which the said decision is based. Following any such rejection the Seller shall make good or otherwise repair or replace the rejected Seller´s Equipment and resubmit it for the tests or inspection in accordance with this Article.

13.5 The Seller shall implement a quality system in accordance with ANNEXES B and G.

13.6 Without prejudice to the Buyer's rights if, in respect of Seller´s Equipment not yet delivered, the Engineer has:

a) verified that work done or materials used by the Seller or by any Sub-contractor is or are defective or not in accordance with the Contract, or that such part is defective or does not fulfill the requirements of the Contract (all such matters being hereinafter in this Article called 'defects'); and

b) as soon as reasonably practicable notified the Seller in writing of the said decision, specifying particulars of the defects alleged and of where the same are alleged to exist or to have occurred,

then the Seller shall without undue delay and at his own expense, make good the defects so specified. Nothing contained in this Article shall affect any contractual claim by the Buyer arising from delay.

## 14. ERECTION, COMMISSIONING AND ACCEPTANCE

14.1 The Erection shall be carried out by the Buyer, or its assignee under the Supervision of the Seller in accordance with ANNEXES B AND C.

14.2 The Seller shall dispatch technical personnel for the Supervision and support of erection in accordance with ANNEX C.

14.3 The Seller shall submit to the Buyer an erection manual according to ANNEX A 2 and a detailed plan related to supervision services required as per ANNEX B.

14.4 After the completion of Erection of the relevant Equipment Unit, the Engineer shall inspect the work with the Seller. When the Engineer states in writing that the Erection is complete, the Engineer shall issue, and the Engineer and Seller shall sign, an "Erection Completion Certificate" for the Equipment Units concerned, which certificate shall not be unreasonably withheld for minor defects and/or modifications not affecting safety and operation of the Contract Equipment.

This Certificate shall not release the Seller from responsibilities for the defects of the Equipment Units found during the subsequent Commissioning, Optimization and warranty period.

14.5 After issue of an Erection Completion Certificate the Seller shall conduct Cold Commissioning of every single part of the Contract Equipment.

14.6 Commissioning shall be carried out by the Seller, utilizing the qualified operating personnel of the Buyer, in accordance with ANNEX C.

Prior to the Commissioning the Seller shall provide the Buyer with the operation and maintenance manuals including procedures, instructions and drawings in bound, indexed, and referenced form, in accordance with this Contract, for the timely Commissioning activities.

The above mentioned manuals shall be submitted to the Engineer for review at the dates set forth in ANNEX A2, Technical Documentation Schedule, however not less than three (3) months before the scheduled commencement of Commissioning as shown in the Contract Program.

14.7 The Buyer shall provide free of charge and in due time the Seller with power and utilities, raw materials, trained operational and maintenance personnel, as specified in ANNEXES B and C, for Commissioning and Optimization of the Contract Equipment.

14.8 The Seller shall promptly eliminate defects and correct errors which the Seller is responsible for at his cost during Commissioning and Optimization and ensure the achievement of the Performance Guarantee Figures as stipulated in ANNEX B hereto.

14.9 In case damages are caused by actions of the Seller's personnel or by wrong instructions of the Seller's personnel or by inferior function of the Contract Equipment, the corresponding expense and charges, thus incurred will be borne by the Seller.

In case damages are caused due to actions of the Buyer's personnel not following the provisions in the Seller's Technical Documentation and the

correct technical instructions given by the Seller's technical personnel, the corresponding expenses and charges, thus incurred will be borne by the Buyer.

14.10 Regardless of the cause, in case damages occur the Seller shall be obliged to assist the Buyer in replacing or repairing the damaged parts.

14.11 After the completion of Cold Commissioning the Engineer shall inspect the respective Equipment Unit with the Seller.

After the completion of Cold Commissioning the date of commencing the Hot Commissioning of the Contract Equipment shall be fixed in line with the Contract Program.

Duration, conditions and procedures for this Cold and Hot Commissioning are detailed in ANNEXES A 2 and B.

14.12 After the completion of Hot Commissioning, and receipt of the Seller's notice, the Engineer shall inspect the Equipment Unit concerned with the Seller. When the Engineer states in writing that the Hot Commissioning is completed the Engineer shall issue and the Engineer and Seller shall sign the "Hot Commissioning Completion Certificate" for the relevant Equipment Unit , which certificate shall not unreasonably be withheld for minor defects and/or modifications not affecting safety and operation of such Equipment.Unit.

This Certificate shall not release the Seller from responsibilities for the defects of the Equipment Unit found during the subsequent Optimization and warranty period.

An Equipment Unit shall not be used for production unless the Hot Commissioning Completion Certificate has been issued. Such use does not constitute acceptance of the Contract Equipment or of any part thereof.

If due to reasons not attributable to the Seller the Hot Commissioning will not have been finalized at the latest fourteen (14) months after the scheduled beginning of Erection of an Equipment Unit , the Hot Commissioning shall automatically be deemed achieved and the relevant Hot Commissioning Completion Certificate shall be issued by the Engineer.

The issuance of the Certificate in accordance with this Article shall not release the Seller from its obligation to perform necessary services with the aim of achievement of Hot Commissioning at a later stage, provided, the circumstances prevailing at that time permit the execution of such services, however at the latest six ( 6 ) months after the date of deemed Hot Commissioning stated in said Certificate. Additional cost for resuming the services shall be compensated by the Buyer.

14.13 Following the issue of the Hot Commissioning Completion Certificate the Optimization Phase will commence. During the Optimization Phase the Optimization and Acceptance Tests for the relevant Equipment Unit shall be carried out with respect to the performance and quality of the relevant

Contract Equipment and process in accordance with Performance Guarantees defined in ANNEX B.

After the performance of the Equipment Unit and the entire process has stabilized, the commencement date of the Acceptance Tests shall be fixed as mutually agreed between Seller and Buyer.

The Seller shall give notice to the Buyer fourteen (14) days prior to any envisaged Acceptance Test.

The Acceptance Tests shall be completed within four ( 4.) months after the respective Hot Commissioning Completion Certificate for such Equipment Unit has been issued and all repeated Acceptance Test not later than eight( 8 ) months after the respective Hot Commissioning Completion Certificate for such Equipment Unit has been issued.

The items to be tested, activities, duration, methods and conditions of the Optimization Phase and the Acceptance Tests are detailed in ANNEX B.

14.14 The Buyer will check and verify each of the Performance Guarantees which shall be achieved in the Acceptance Tests Period in accordance with the Technical Documentation supplied by the Seller and the requirements stipulated in the Annexes to the Contract under guidance of the Seller's technical supervision personnel.

14.15 If the Performance Guarantees are fulfilled as stipulated in ANNEX B, the Equipment Unit is free of defects, and outstanding Work under the Contract has been completed, excluding as-built drawings, to the reasonable satisfaction of the Engineer, the Certificate of Acceptance of the Equipment Unit shall be set up by the Engineer and signed by the Engineer and Seller within ten (10) days of the last test in 6 (six) originals, 3 (three) for each party, always provided that the Seller has remedied such minor defects or completed modifications originated from Cold and Hot Commissioning to the satisfaction of the Engineer.

The Certificate of Acceptance may be withheld by the Engineer until outstanding defects and modifications have been completed.

The Certificate of Acceptance shall not be unreasonably withheld by the Engineer for outstanding minor defects/ modifications not affecting safety and operation of the Equipment. Unit.

14.16 If any Acceptance Test fails, or is not completed within the times specified in this Article, the Seller shall make at his own expense necessary repair, replacement and/ or modifications to the Equipment Unit , unless the failure of the Acceptance Test is attributable to the Buyer.

If any Acceptance Test fails or is not completed within the times specified in this Article, for reasons not attributable to the Seller, the Seller is entitled to be compensated by the Buyer for the costs of repeating the Test.

14.17 In any instance of failure during an Acceptance Test, up to two further Acceptance Tests shall be carried out if deemed necessary. The Seller

 shall give notice to the Buyer fourteen (14) days prior to the envisaged further Acceptance Tests.

In case any repair or modification should affect the results of formerly successful tests, the Seller shall repeat even those tests if deemed necessary in the reasonable opinion of the Engineer, in order to comply with ANNEX B. These repeated tests shall be carried out at no cost to the Buyer regarding the Seller's personnel and other costs resulting from the repetition of the test, with the exception of the cost of production, Buyer's personnel, product, raw material and production consumables used in carrying out the tests. In case such Tests are caused by the Buyer, the direct cost thereof will be borne by the Buyer.

14.18 If due to reasons not attributable to the Seller any Acceptance Test will not have been finalized at the latest twelve (12) months after the date of First Heat , said Acceptance Test shall automatically be deemed achieved and the relevant Equipment Unit accepted and the Certificate of Acceptance shall be issued by the Engineer.

The issuance of the Certificate of Acceptance in accordance with this Article shall not release the Seller from its obligation to perform necessary services with the aim of demonstrating the Equipment Unit´s capability to achieve the Performance Guarantees at a later stage, provided the circumstances prevailing at that time permit the execution of such services. Additional cost for resuming the services shall be compensated by the Buyer.

14.19 The Acceptance of the Equipment Unit shall not release the Seller from his contractual obligation to remedy minor defects/ modifications mentioned in the Certificate of Acceptance and his responsibility for the Equipment Unit during the warranty period.

14.20 After the Certificate of Acceptance for the Equipment Unit has been issued by the Engineer, the Performance Guarantee covering ten (10) percent of the Contract Price (as per the specimen in ANNEX K2) shall be returned to the Seller.

14.21 In case the Acceptance Tests will not be successfully performed according to the provisions of this Contract and its Annexes the Buyer reserves any and all applicable statutory rights subject to Article 18.

## 15. WARRANTIES AND REPRESENTATIONS

15.1 The Seller warrants and represents that:

a) It has obtained and maintains during the term of the Contract all permits, licenses and authorizations ( including the General Contractor licence ) necessary to fulfill its obligations under the Contract;

b) The Equipment Unit is in accordance with the state-of-the-art as incorporated in ANNEX B at the date of signing of the Contract, unless specified otherwise in this Contract;

c) The Equipment Unit is free of defects in engineering, materials and workmanship and in accordance with the requirements of the Contract and its ANNEXES;

d) The Equipment Unit is suited for its specified use as defined in the Contract and complies with the requirements of the Contract specified production processes and safe operation as well as their long-term operation;

e) The quality of the products to be processed with the Contract Equipment completely fulfills the requirements of ANNEXES B and E.

f) The Equipment Unit is in accordance with the Laws in force as of the Effective Date including but not limited to environmental and safety regulations provided however that the provisions of Article 2.2.11 apply accordingly.

g) NOT USED

h) The Technical Documentation supplied by the Seller is complete and correct, and meets the specified requirements of engineering and for Erection, operation and maintenance of Equipment Unit and is in accordance with ANNEX J.

i) Seller´s Equipment is designed to maintain normal, safe and stable operation and fulfills the Performance Guarantees stipulated in ANNEX B of the Contract.

j) The spare parts or adequate substitutes for all parts of Seller´s Equipment can be provided by the Seller and purchased by the Buyer for a minimum period of twenty (20) years beginning from the Date of Acceptance.

With regard to changes of the Laws, the reference date is the Effective Date. After this reference date, the Parties shall inform each other without undue delay about any changes, which may have a material impact on the Contract Equipment. Both parties shall always observe the relevant Laws and changes thereto.

Excluded from this warranty are normal wears and tears, damage to the Equipment Unit caused by the Buyer resulting among others from wrong or no maintenance or incorrect operation and storage.

15.2 In case Seller´s Equipment prior to the Date of Acceptance or during the warranty period does not fulfill the Contract specifications or Seller´s Equipment is damaged, or otherwise totally or partially disabled or is unable to meet the performance specifications, or reveals any other kind of defect, the Buyer shall notify the Seller and the Seller shall remedy the defects by replacing or repairing the defective Seller´s Unit and modifying the technical documentation in the manner that the same will insure the quality and performance of Seller´s Equipment will meet the contractual specifications.

All the cost for transportation, insurance, import duties, taxes, licenses, repair, replacement and the like arising from the remedy of the defects, and other related expenses shall be borne by the Seller.

For the purposes of fulfillment of its obligations under this Article 15.2, the Seller shall be given access to the Equipment Unit by the Buyer, at times, and for periods that do not cause unreasonable interference with construction or operation of the plant as determined by the Buyer.

15.3 The warranty period for the respective Seller´s Equipment shall be as follows:

a) twenty four (24) months beginning from the Date of Acceptance, however, should the issuance of the Certificate of Acceptance be delayed, the warranty period commences on the eleventh (11th) day after the last Acceptance Test of the respective Equipment Unit has successfully been completed.

b) The warranty period for Seller´s Equipment shall end not later than six (6) months after the envisaged date for the expiration date of the warranty period specified in the Time Schedule as of the Effective Date, unless Acceptance is delayed due to reasons the Seller is responsible for in which case the such expiration date will be postponed according to the delay.

c) Once the warranty periods Seller´s Equipment concerned have expired, the Buyer shall issue upon Seller's request the confirmation of the expiry of the respective warranty period for the Contract Equipment.

15.4 Not used.

15.5 The warranty period for spare parts shall be thirty six (36) months from date of delivery of the spare parts or twenty four (24) months beginning from installation of the spare parts whichever period is shorter.

15.6 If during the warranty period operation of the Seller´s Equipment or of the affected piece of Seller´s Equipment has to be stopped owing to repair/ replacement of defective Equipment Unit the warranty period shall be extended for the affected part or the complete Equipment Unit , as the case may be, according to the duration of interruption. The warranty period for replaced parts of Contract Equipment is twelve (12) months after the completed repair/ replacement but expires not earlier than the end of the warranty period stipulated in Article 15.3.

15.7 Should any minor defects to Seller's Equipment occur during the warranty period, the Buyer will consider and has the right to repair such defects at the Construction Site at Seller's cost after written information to the Seller and the Seller's written confirmation.

15.8 After the expiry of the warranty period of Seller's Equipment, the Seller shall offer after-sale services to the Buyer. Should any emergent and abnormal conditions be found in the running of Seller's Equipment, the Seller shall, at the request of the Buyer, give prompt and effective support to the Buyer at the Buyer's cost.

15.9 Should, due to the fault of the Seller, any replacement and/ or supplement of Technical Documentation be necessary during the warranty period, the Seller shall deliver free of charge the corresponding replacement and/or supplement documentation to the Construction Site.

15.10 In case the Buyer is responsible for any defects or damage, the Seller shall be obliged to render the Buyer the technical instructions as to eliminate the defects or refurbish the equipment and materials, and the costs incurred there from shall be borne by the Buyer.

15.11 Not used

15.12 Not used

15.13 Excluded from the warranty are major repairs and/or modifications performed by the Buyer without authorization of the Seller.

15.14 The Seller shall make good any defects in Seller's Equipment during the warranty period for which the Seller is responsible.

15.15 However, it is expressly understood and agreed that the term "Performance Guarantee" and other similar terms, including the verb "to guarantee", are not to be considered as giving a guarantee within the meaning of Sections 443, 444 and 639 German Civil Code ("Beschaffenheits-" and/or "Haltbarkeitsgarantien") but only as a warranty commitment with the legal consequences set forth under Sections 437 and 634 German Civil Code. Sections 444 and 639 German Civil Code are hereby expressly excluded.

15.16 During the Warranty Period the Parties will carry out a Productivity Campaign in accordance with stipulation in ANNEX B Part 6.

## 16. SELLER'S DEFAULT

16.1 If the Seller is in material breach of his obligations under the Contract, including but not limited to

a) assigning the Contract without Buyer's prior approval, or

b) sub-letting all or part of its obligations without prior approval by the Buyer, or

c) failing to make good, repair or replace any non-conforming Seller's Equipment or part thereof, within a reasonable time after being notified by the Engineer, or

d) delays in performing the Works by more than 6 months or

e) suspending without excuse the performance of the Contract for a period exceeding seven (7) days after receiving from the Engineer written notice to proceed,

then the Buyer may give fourteen (14) days notice to the Seller to remedy the default.

If such notice expires and the Seller has not commenced to remedy the default in a substantial manner, the Buyer may without prejudice to any other remedy under the Contract forthwith terminate the Contract, or part thereof, as the case may be, but without thereby releasing the Seller from any of his obligations or liabilities which have accrued under the Contract and without affecting the rights and powers conferred by the Contract on the Buyer.

Upon such termination the Buyer may himself complete the Seller's Equipment concerned, in which event the Seller shall provide access and hand over Seller's Equipment in its then state to the Buyer or as the Engineer may direct.

16.2 As soon as practicable after the Buyer has terminated the Contract, according to Article 16.1, the Engineer shall, by or after reference to the Parties and after making such inquiries as he thinks fit, evaluate the value of the Work performed by the Seller as of the date of termination. The amount so determined is herein called the Preliminary Termination Value, which the Engineer shall submit to the Buyer and the Seller for amicable final settlement between the Parties. If such settlement will not be reached within thirty (30) days the issue shall be referred to arbitration unless extension of this period is mutually agreed between the Buyer and the Seller.

16.3 The Buyer shall not be obligated to make any further payments to the Seller for the Works already performed and determined as the Preliminary Termination Value until third party has been engaged to perform the outstanding Work and all expenses to be incurred by the Buyer have been ascertained, and such amount has been certified with supporting documentation by the Engineer (herein called the Cost of Completion).

If the Cost of Completion when added to the total amounts already paid to the Seller, as at the date of termination, exceeds the Contract Price, the Engineer shall certify such excess and the Seller shall upon demand pay to the Buyer the amount of such excess, however limited to fifty (50) % of the Contract Price.

Any such excess shall be deemed a debt due by the Seller to the Buyer and shall be recoverable within 30 (thirty) days after the Certification by the Engineer and the invoice is issued by the Buyer. If there is no such excess the Seller shall be entitled to be paid the difference (if any) between the Preliminary Termination Value and the total of all payments received by the Seller as at the date of termination within 30 (thirty) days after the invoice is issued by the Seller.

16.4 If either Party becomes bankrupt or insolvent, or has a title made against him, or compound with his creditors, or commences to be wound up, not being a members' voluntary winding up for the purpose of amalgamation or reconstruction, or have an administration order made against him or carry on his business under an administrator or a receiver or manager for the benefit of his creditors or any of them, the other Party shall be entitled:

a) to terminate the Contract forthwith by notice to the Party concerned or to the receiver, manager, administrator or liquidator or to any person in whom the Contract may become vested, in which event the provisions of Article 16 shall apply; or,

b) to give such receiver, manager, administrator or liquidator or other person the option of carrying out the Contract subject to his providing a guarantee for the due and faithful performance of the Contract up to an amount to be agreed.

## 17 LIABILITIES

17.1 From the Effective Date until the warranty period (as per Clause 15.3) expires, the Seller shall be responsible for the proper execution of his obligations under the Contract. After the Date of Acceptance, the Seller shall remain responsible to perform Seller's outstanding work under the Contract if any, and for the items to be removed from the Construction Site by the Seller and shall be liable for damage caused by the Seller in performing his warranty obligations.

In the event that any part of Seller's Equipment shall suffer loss or damage whilst the Seller has responsibility for the care thereof, the same shall be made good by the Seller.

Without limiting the generality of the Seller's obligations, the Seller shall be responsible for:

a) the care of equipment, components, tools, etc. entrusted or provided to the Seller by the Buyer or the Engineer for the purpose of or in connection with carrying out the Work under the Contract, whether on or off Construction Site;

b) working equipment, components, tools, etc. brought onto the Construction Site by the Seller or Seller's Sub-contractors for the Work under the Contract; and

c) the Contract Equipment while in the care of the Seller; and

d) working equipment and tools provided by the Buyer when used by the Seller.

17.2 In the event that any part of the Contract Equipment suffers loss or damage while the Seller has responsibility for the care thereof, the same shall be made good by the Seller.

17.3 Seller shall be liable to Buyer for any, loss of or damage to third party tangible property (including Buyer's property other than the Work insured under 19.2) and for death of or injury to persons, including but not limited to employees and agents of Seller, caused by any acts and/or omissions of Seller in the performance of the Contract, and Seller shall indemnify and hold Buyer harmless against and from any and all claims or costs asserted against Buyer by third parties in consequence thereof. Seller shall be liable for all such acts and/or omissions of Sub-contractors or other third parties whose services and/or supplies Seller uses in the performance of this Contract in the same way as for Seller's own acts or omissions.

17.3 a In case one Party is liable to the other Party such liability is limited to gross negligence and willful acts. However neither Party shall be relieved from liability for negligence, in case the other (non defaulting) Party suffers proven damage regarding such non defaulting Party's site activities due to acts, omissions or other non compliance by defaulting Party's sub-contractors. Each Party is obliged to mitigate the damages suffered by the other Party.

17.4 Neither Party shall be liable to the other Party for any consequential damages and/or indirect damages, expenses, or losses such as loss of profit, loss of production and the like unless caused by willful acts or through gross negligence.

17.5 In case damages are caused by actions of the Seller's personnel or by wrong instructions of the Seller's personnel or by incorrect function or malfunction of the Contract Equipment, the corresponding expense and charges thus incurred shall be borne by the Seller.

In case damages are caused due to actions of the Buyer's personnel not following the provisions in the Seller's Technical Documentation and the correct technical instructions given by the Seller's technical personnel, the corresponding expenses and charges thus incurred shall be borne by the Buyer.

17.6 The maximum liability of the Seller with respect to incorrect or incomplete engineering, advice or information provided by the Seller to assist the Buyer or other contractors engaged by the Buyer, not related to Seller´s Equipment, is limited to a maximum of 10 (ten) percent of the Contract Price.

17.7 The Seller's overall liability (with the exception of any warranty and claims for consideration as per Article 18, liability for death or personal injury and property damages) under or in connection with this Contract, whether arising out of a breach of contract, tort including (but not limited to) negligence or of statute or otherwise, shall in the aggregate be limited to fifty (50) % of the Contract Price.

17.8 All the limitations of Seller's liability shall apply also for the benefit of Seller's agents, sub-contractors, suppliers, servants and personnel.

18 CONSIDERATION FOR DELAY, UNDER- AND NON-PERFORMANCE

18.1 If the date of the First Heat of an Equipment Unit is beyond the date nominated in the Schedule of Milestones (ANNEX A2), due to reasons solely attributable to the Seller, the Seller shall pay the Buyer a consideration for such delay at the following rates:

One point one percent (1.1%) of the Contract Price of the respective Seller´s Equipment for each full week of delay up to a maximum of seven point five percent (7.5%) of the Contract Price for the respective Seller´s Equipment.

18.2 If the Technical Documentation, marked with a "P" in the Technical Documentation Schedule in ANNEX A2, Article 3, has not been delivered at the dates nominated in this schedule, due to reasons attributable to the Seller or Sub-contractors, the Seller shall pay the Buyer a consideration for such delay in delivery at a rate of zero point zero five percent (0.05%) of the Contract Price for each commenced Day of delay. The maximum consideration for the delivery of Technical Documentation shall not exceed one percent (1%) % of the Contract Price.

18.3 The aggregate sum of payments under Article 18.1 and Article 18.2 shall not exceed 7.5% of the Contract Price.

18.4 The payment of the consideration for delay of First Heat shall not release the Seller from his obligations to commission the Contract Equipment under this Contract.

18.4 a) If due to reasons attributable to the Seller the under-performance of the Performance Guarantees is less than those stipulated in Article 18.5, the Buyer shall have the right to

a) direct the Seller to take all action at the Seller's cost, including replacement of the under-performing parts of Seller´s Equipment up to the total replacement of the under-performing Seller´s Equipment, to make the Contract Equipment concerned reach the Performance Guarantees and/or statutory requirements as stipulated in Article 18.5, provided that such actions warrant successful remedy of such under-performance and are reasonable in the relevant circumstances, or

b) claim a consideration, in which case the consideration scheme as stipulated under Article 18.5 shall apply.

18.5 Should after the last repetition of the Acceptance Test as per Article 14.16 one or more of the Performance Guarantees as set forth in ANNEX B Part 6 hereto, not have been achieved even after the expiry of the extended period of seven (7) months after the failure of the first Acceptance Test, however not later than fourteen (14) months after the Hot Commissioning has been completed, and thus Buyer cannot reasonably expect the completion of the Acceptance Test(s), the Seller shall upon Buyer's request pay considerations, applied accumulatively, at the following rates:

A company of ThyssenKrupp Stainless **ThyssenKrupp Stainless USA**

18.5.1 Electric Arc Furnace

**Considerations for Non-performance for EAF**

≤ 1.0 % oxidised Cr

$Cr_{ox}$ after 5 min reduction time

| | | | | | | | | Considerations (% of the contract price of the equipment) | |
|---|---|---|---|---|---|---|---|---|---|
| Item No. | Guarantee Item | Number of tests / hours | Unit | Guarantee value Ref Chap 6.3 | Start of Considerations | Incremental step | Number of steps | Considerations per incremental step | Maximum Considerations |
| 1 | Electrode Consumption 155 MVA transformer | 12 h | kg/t | =< 2,6 | 2,7 | 0,1 | 4 | 0,1 | 0,4 |
| 2 | Power On Time 155 MVA transformer | 12 h | min | =< 60,0 | 61 | 1 | 4 | 0,25 | 1 |
| 3 | Electric Power Consumption 155 MVA transformer | 12 h | kWh/t | =< 470,0 | 475 | 1 | 9 | 0,15 | 1,35 |
| 4 | Electrode Lifting Speed | 1 x | mm/sec | =< 250,0 | 240 | 2 | 15 | 0,01 | 0,15 |
| 5 | Roof Lifting | 1 x | Sec. | =< 10,0 | 11 | 1 | 9 | 0,02 | 0,18 |
| 6 | Roof Swivelling | 1 x | Sec. | =< 20,0 | 21 | 1 | 9 | 0,02 | 0,18 |
| 7 | Tilting Speed Tap side | 1 x | °/sec | =< 1,0 | 1,1 | 0,01 | 10 | 0,02 | 0,2 |
| 8 | Tilting Speed Slag side | 1 x | °/sec | =< 1,5 | 1,6 | 0,01 | 10 | 0,02 | 0,2 |
| 9 | Electrode Slip Time | 1 x | seconds | =< 45,0 | 50 | 1 | 10 | 0,02 | 0,2 |
| 10 | Electrode Exchange Time | 1 x | min | =< 5,0 | 6 | 1 | 5 | 0,03 | 0,15 |
| | Total | | | | | | | | 4,0 |

A company of ThyssenKrupp Stainless **ThyssenKrupp Stainless USA**

18.5.2 AOD Converter

**Considerations for Non-performance for AOD**

| Item No. | Guarantee Item | Number of tests / hours | Unit | Guarantee value Ref Chap 6.3 | Start of Considerations | Incremental step | Number of steps | Considerations (% of the contract price of the equipment) | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Considerations per incremental step | Maximum Considerations |
| 1 | Productivity and availability (304 or 430) | 12 hours | heats | 2 x 10 | 18 | 1 | 2 | 0,23 | 0,46 |
| 2 | Productivity and availability (409) | 12 hours | heats | 9 | 8 | 1 | 2 | 0,23 | 0,46 |
| 3 | Charge to tap time AOD (304 or 430) | 3 x 10 heats | min | 55 | 57 | 1 | 3 | 0,12 | 0,36 |
| 4 | Charge to tap time AOD (409) | 9 heats | min | 75 | 77 | 1 | 3 | 0,12 | 0,36 |
| 5 | Charge to tap time AOD (201) | 5 heats | min | 75 | 77 | 1 | 3 | 0,12 | 0,36 |
| 6 | Charge to tap time AOD (Mn content 4,5 %) | 5 heats | min | 75 | 77 | 1 | 3 | 0,12 | 0,36 |
| 7 | Reduction efficiency | 5 heats | % | < 1.0 % oxidised Cr Cr ox after 5 min reduction time | 1,2 | 0,2 | 5 | 0,05 | 0,25 |
| 8 | Nominal capacity | 1 test | t | 180 | 179 | 1 | 9 | 0,02 | 0,18 |
| 9 | Vessel exchange time | 1 test | min | 85 | 87 | 1 | 3 | 0,1 | 0,3 |
| 10 | Regulating accuracy of gas media 6:1 1:5 | 1 test 4 ranges | % | +/- 1% | +/- 1,1 % | 0,5 | 4 | 0,03 | 0,12 |
| 11 | O2 lance life time | one lance during warrenty period | | 1000 heats | 900 | 50 | 2 | 0,1 | 0,2 |
| 12 | O2 Lance exchange time | 1 | min | 15 | 17 | 1 | 3 | 0,04 | 0,12 |
| | Total | | | | | | | | 3,5 |

18.5.3 Continuous Caster

### Considerations for Non-performance for Slab Caster

For performance figures and procedures for evaluation refer to Annex B, Chapter 6.3.4

| Item No. | Guarantee Item | Guaranteed Value | Unit | Start of Considerations | Incremental step | Number of steps | Considerations (% of the contract price of the equipment) | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Considerations per Incremental step | Maximum Considerations |
| 1 | Casting speed - austenite | 1.3 (0.9) | m/min | 0,1 | 0,1 | 5 | 0,20 | 1,00 |
| 1 | Casting speed - ferrite | 1.1 (0.9) | m/min | 0,1 | 0,1 | 5 | 0,20 | 1,00 |
| 2 | Thickness | ≤ ± 2 | mm | 0,5 | 0,5 | 5 | 0,05 | 0,25 |
| 4 | Width | ≤ ±0.5<br>≤ ± 1.2 (ferrite) | % | 0,2<br>0,5 | 0,2 | 5 | 0,05 | 0,25 |
| 8 | Narrow face bulging | -5 to 10 (austenite)<br>-5 to 25 (ferrite) | mm | 2<br>2 | 2 | 5 | 0,05 | 0,25 |
| 3 | Thickness difference | ≤ 2 | mm/m | 0,2 | 0,2 | 5 | 0,05 | 0,25 |
| 9 | Curvature | ≤ 3 | mm/m | 0,5 | 0,5 | 5 | 0,05 | 0,25 |
| 10 | Warpage | ≤ 3 | mm/m | 0,5 | 0,5 | 5 | 0,05 | 0,25 |
| 11 | Restranding time | ≤ 40 | min | 5 | 5 | 5 | 0,025 | 0,125 |
| 12 | Component exchange times | value as per 6.3.4.3.3.2 | min | 5 | 5 | 5 | 0,025 | 0,125 |
| 13 | Ladle exchange time | ≤120 | sec | 10 | 10 | 5 | 0,025 | 0,125 |
| 14 | Internal quality | L/Q ≤ 0.3 | - | 0,05 | 0,05 | 5 | 0,05 | 0,25 |
| 15 | Surface quality | as per Table 1 | % | 0,25 | 0,25 | 5 | 0,05 | 0,25 |
| 16 | Caster Yield and Sequence Casting | ≥ 98,5 | % | 0,25 | 0,25 | 5 | 0,05 | 0,25 |
| 17 | Mold Level Control | ≤ 2 | mm | 0,5 | 0,5 | 5 | 0,025 | 0,125 |
| 18 | Mold oscillation stability | value as per 6.3.4.3.8 | mm | 0,1 | 0,05 | 5 | 0,025 | 0,125 |
| | TOTAL: | | | | | | | 4,88 |

18.6 If any other Performance Guarantees than the above mentioned Performance Guarantees above is not achieved, Seller's Equipment shall be repaired or replaced by the Seller at its own costs within the times mutually agreed by the Engineer and the Seller until the respective Performance Guarantees are met.

18.7 If the US Laws cannot be fulfilled, thus preventing approval of the Contract Equipment for Commissioning or Operation, the Buyer has the rights to reject such Contract Equipment.

18.8 NOT USED

18.9 In the event the Buyer claims the final consideration for under-performance of a Performance Guarantee stipulated under Clause 18.5 above, the Buyer shall forthwith release the Seller from his further obligation to make good Seller's Equipment related to such Performance Guarantee, and consequently the Certificate of Acceptance shall not be denied by the Buyer for reasons of this under-performance.

18.10 If the Seller fails to rectify a substantial under-performance of one of the Performance Guarantees beyond the acceptable limits set forth in Clause 18.5 in accordance with Article 18.4 a) ('non-performance') and following formal notification from the Engineer to the Seller and after a further period of two (2) weeks the Buyer may execute his statutory rights.

18.11 The Seller shall pay the considerations to the Buyer within thirty (30) days after receipt of Buyer's written notice and invoice.

18.12 If the Seller fails to pay any amounts due to the Buyer, the Buyer may deduct from any monies, which may be, or become, payable to the Seller and/ or may take recourse to the applicable guarantee as per Annex K.

18.13 All payments by the Buyer for Acceptance are made conditional on satisfaction of any payments of any consideration due.

18.14 Non reservation of any claim for consideration by the Buyer does not constitute a waiver of such claim.

18.15 Payment of a consideration pursuant to this Article constitutes the sole and final remedy for the respective item, with the exception of the Buyer's rights set forth in Art. 2.2.12, 4.3, 4.4 and 16.

18.16 The aggregate sum of payments under 18.1, 18.2 and 18.5 shall not exceed thirteen point five percent (13,5%) of the Contract Price.

## 19 INSURANCE

### 19.1 Seller's insurances

19.1.1 Seller shall take out and maintain or shall procure for the Work the taking out and maintenance of the following insurances which must be legal and valid in all countries where the Work generating the relevant risk is performed, and which shall remain in force for as long as Seller has any relevant obligations under the Contract, which are insured, however, not longer than until end of warranty period:

a) adequate insurance covering loss of or damage to construction equipment of Seller which has temporarily been brought to the Construction Site and that of its personnel, Sub-contractors or other agents of Seller, against risks usually covered under Contractor's Plant and Equipment insurance,, for as long as such property of Seller, its personnel, Sub-contractors or other agents remains on Buyer's premises for the purposes of performance of Seller's obligations under this Contract,

b) third party liability insurance covering legal liability of Seller to third parties of physical loss or damage, death or bodily injury incurred by them arising out of the performance of the Work; with a combined single limit of not less than USD ten (10,000,000) per occurrence and USD twenty million (20,000,000) per year,

c) adequate Automobile Liability Insurance against claims by third parties in respect of loss, damage, death or bodily injury incurred by them arising out of or in connection with the use of owned, leased, non-owned and hired motor vehicles used for performance of the Work by Seller or Sub-contractors or other agents of Seller as required by applicable Law; if applicable adequate waterborne and airborne craft liability insurance for owned, non-owned or hired craft that are used for performance of the Work by Seller or Sub-contractors or other agents of Seller, covering liabilities arising from the use and/or operation of the waterborne craft (including floating construction equipment) or the airborne craft (as the case may be) in the care, custody or control of Seller or any Sub-contractor, including liability for damage due to collision, pollution and removal of wrecks, as required by applicable Law

d) Unless covered by the OCIP, workers' compensation, employers' liability insurance or any other Work-Accidents insurance as required by the applicable laws wherever the Work is to be performed and wherever the contracts of employment of personnel of Seller or Sub-contractors or other agents of the Seller's personnel are made or expressed to be made. Under no circumstances, Buyer shall be liable for any lack of adequacy of such insurance and Seller shall hold Buyer harmless in respect of any claims for damages of injured person(s) of Seller, its Sub-contractors or other agents of Seller due to Seller's lack of such insurance and unless such injury is due to reasons attributable to the Buyer.

e) adequate marine and transport insurance up-to the point of delivery for any Seller´s Equipment and materials and construction equipment procured by Seller or Sub-contractors or other agents of Seller until the point of delivery.

f) any other insurance which the Seller is required to take out under the applicable laws.

19.1.2 In respect of the insurances which Seller is required to procure or have procured under Article 19.1.1, Seller shall ensure that:

a) evidence of the respective insurance (except insurances under General-Social-Security- or Work Accidents Systems) in the form of certificates of insurance is provided to Buyer within thirty (30) days from Effective Date [or from such time as is appropriate in respect of the risks to be insured].

b) all insurance relevant incidents regardless of whether such an incident is covered by insurance or not shall be promptly reported to Buyer.

c) all insurances shall be effected with financially sound and reputable insurers for 3rd party liability insurance as per 19.1.1b, i.e. at least A-rated according to generally accepted international rating standards such as A.M. Best, Standard and Poors etc. except state insurers, and other Social- Security or Work-Accidents insurers, and other obligatory insurers.

d) in case no material alterations in form and content of the terms of any insurance as well as cancellation or expiration of cover shall be made without prior written approval of Buyer occurs, the Seller shall inform the Buyer and the Parties shall agree on the further course of action, but not to the disadvantage of the Buyer.

e) Sub-contractors meet their respective obligations as referred to in this Article to the extent applicable (however amounts and conditions may differ considering their limited/smaller contract price and scope of work).

f) all insurances contain a waiver of subrogation against Buyer and names Buyer as an additional insured for claims made against the Buyer caused by any acts and/or omissions attributable to the Seller in the performance of the Contract as far as possible under relevant Laws.

g) subject to periods stipulated in above Article 19.1 each insurance is kept fully valid (or is to be renewed or substituted, e.g. in case they are on a year to year basis) to the extent relevant from time to time for the duration of Seller's performance of its obligations under the Contract which are relevant for the respective insurance.

19.2 Buyer's insurance

19.2.1 Buyer shall provide and maintain at its expense a Construction-Erection-All-Risks-Insurance (Builders Risk Insurance). Seller shall be responsible for the respective deductibles in case a damage is caused by the Seller.

19.2.2 A summary of the insurance policy to be taken out by Buyer pursuant to Article 19.2.1 is attached as ANNEX L.

19.3 Optional Owner Controlled Insurance Program

19.3.1 Buyer has elected to implement a Buyer controlled insurance program (OCIP) that will provide Workers' compensation, Employer's Liability, General Liability and Excess Liability Insurance for Seller and all eligible Sub-contractors of every tier providing direct labor on the Construction Site. Buyer would pay all premiums associated with the OCIP including deductibles or self-insured retentions.

19.3.2 Seller will identify for Buyer the actual cost to obtain the coverages specified above for the Work as applicable to Seller and each of its Sub-contractors and sub-suppliers of whatever tier. Seller will identify such costs as line items on the bid documents provided under this Contract and will include the following information concerning the insurance:

(a) Premium index estimate (payroll, receipts, sub-contract cost, or other basis)

(b) Applicable rates

(c) Estimated premiums

(d) all other information necessary to enroll as a contractor

Buyer will have the right, but not the obligation, to procure comparable coverage and limits, and, if Buyer so elects, a deductive Variation for Seller's actual cost of such insurance will be issued in accordance with the terms of this Contract. To the extent that Buyer provides coverage specified in this Contract, that coverage will apply only to Work performed at, or emanating directly from, the Project site. Seller and each Sub-contractor and sub-supplier to whatever tier will remain obligated to provide the type and limit of that coverage for all other operations of Seller and each Sub-contractor and sub-supplier to whatever tier excluding only operations performed in connection with work at the Project site.

Furnishing any insurance specified in this Contract by Buyer will in no way relieve or limit any responsibility or obligation imposed by this Contract on Seller or any Sub-contractor and sub-supplier to whatever tier. In addition, the Buyer-provided insurance will not apply to vendors, suppliers, materialmen, and others who merely transport, pick up, deliver or carry materials, personnel, parts, equipment, or any other items or persons to or from the Project site. Buyer makes no representations, guarantees, or warranties, express or implied, as to the fitness and/or quality of coverage.

19.3.3 A summary of the insurance policy that will be taken out by Buyer pursuant to Article 19.3.1 is attached as ANNEX L.

19.4 Subject to the provisions of Article 19.1 and ANNEX L it shall be expressly understood that the taking out of any insurance shall not relieve Seller or Sub-contractors or other agents of Seller of any liability arising out of the Contract or of applicable Laws.

## 20 INTELLECTUAL PROPERTY

20.1 All Intellectual Property in all Intellectual Property Items shall vest in the Buyer or Seller as the case may be, on creation of the Intellectual Property Items.

Herewith the Seller grants to the Buyer the non-exclusive, non-transferable irrevocable right to use the drawings, documents, data, equipment-related know-how and experience, patented and/or not-patented technical knowledge, received from the Seller under this Contract for the purpose of operating and maintaining Seller's Equipment. This right includes the unencumbered right to sell the products manufactured with Seller's Equipment to the clients of the Buyer.

20.2 Seller warrants that Seller's Equipment and/or use thereof does not and will not infringe any patents or other intellectual property rights of any third party whether within or outside the United States. Seller agrees to indemnify, defend and hold harmless the buyer and its affiliates from all claims alleging violation or infringement of any Intellectual Property rights of any third party or other proprietary right relating to Seller's Equipment provided by Seller, or any alleged improper disclosure or use of any trade secret arising from the manufacture, use or sale of any goods delivered as a result of this Contract even if they are made to Buyer's specifications.

20.3 Drawings prepared by the Seller, including Sub-contractors, and supplied to the Buyer as part of this Contract shall become the property of the Buyer, without prejudice to the intellectual property rights of the Seller in the frame of the rights of the Buyer laid down in Article 10.10.

20.4 Software licenses, applicable and within the Seller's scope of supply, are deemed to be included in the Contract Price. The use of the delivered software or part thereof is strictly limited to the system for which they are intended. Software can only be copied and used on other CPUs with the prior consent of the Seller in the event of failure or interruption of the CPU.

The copying of software other then for backup reasons is subject to the Seller's written approval under consideration of copyright of the original and all copies. Copies of such software may only be produced on a CPU to be approved by the Seller. Software shall not be made accessible to any third party by the Buyer without prior approval by the Seller.

All software rights remain with the Seller. Application source programs and supervision software form part of the scope of supply by the Seller, as stated in the Technical Specification. Should the Buyer, without the prior written consent of the Seller amend such source programs, then the Seller shall not be liable for any consequences thereof.

## 21 CONFIDENTIALITY

21.1 For a period of ten (10) years from the Effective Date the Parties shall keep confidential the Technical Documentation inclusive of any information relating to the technical knowledge and patented technologies associated with Seller's Equipment and confidential information received from the other Party except for:

a) third parties engaged in project work, maintenance, operation and manufacturing of spare parts which shall be subject to the same confidentiality; or,

b) the receiving Party being already in possession of the technologies which are identical with the abovementioned Technical Documentation; or,

c) the receiving Party having already obtained the abovementioned Technical Document and/or confidential information from other sources under no secrecy obligation, prior to obtaining the Technical Documentation from the Seller; or,

d) the technical knowledge becomes known to the public through no fault of the receiving Party; or,

e) any requirements by the law to disclose such Technical Documentation and/or confidential information.

21.2 NOT USED

21.3 The Seller and Buyer shall treat the details of the Contract and any information made available in relation thereto as confidential and neither of them shall publish or disclose the same or any particulars thereof (save insofar as may be necessary for the purposes of the Contract), without the previous consent of the other provided that nothing in this provision shall prevent the publication or disclosure of any such information that has come within the public domain otherwise than by breach of this Article, or which is required to be disclosed by the Law (provided, however, if such event, the recipient agrees to use reasonable efforts to provide the disclosing party with written notice of such potential disclosure, and provide the disclosing party with a reasonable opportunity to secure the confidential protection thereof).

**22 TAXES AND DUTIES**

22.1 Buyer shall bear and pay on its own expense any taxes, fees, duties, contributions and other charges levied inside the United States on the Import Portion of the Contract Equipment after FOB/FCA delivery.

22.2 Seller, and its Sub-contractors, shall bear and pay on its own expense any taxes, fees, duties, contributions and other charges levied outside the United States on the Import Portion of Seller's Equipment until FOB/FCA delivery.

22.3 Seller, and its Sub-contractors, shall bear and pay on its own expense any taxes, fees, duties, contributions and other charges levied inside the United States in connection with the performance of the Work for the Local Portion of Seller's Equipment including, but not limited to:

a) net worth, business, sales and use, value added, excise storage, stamp duty and consumption taxes; licenses, permit and registration fees; income, profit, remittance, franchise and ad valorem taxes;

b) employment taxes and contributions with respect to or measured by compensation (wages, salaries or other) paid to employees of Seller including, but not limited to, taxes and contributions for unemployment compensation insurance, old age benefits, welfare funds, pensions and annuities and disability insurance; and

c) license fees and other charges.

22.4 Under no circumstances will sales, use or any other tax be added to the Contract Price.

a) Under Alabama law, to the extent that Seller, and its Sub-contractors, are treated as a contractor with respect to the Work, said Seller and its Sub-contractors will be treated as the taxpayer and thus will be responsible for any state or local sales, use and other taxes related to the Work. Seller shall directly pay when due all Mobile County non-abated sales and use tax imposed and applicable to the Seller's performance of the Work and this Contract. Likewise, each Sub-contractor shall directly pay when due all Mobile County non-abated sales and use tax imposed and applicable to the Sub-contractor's performance of the Work and this Contract.

b) In all other circumstances, if Buyer has obtained direct pay permit authority, neither Seller nor any Sub-contractor shall include any allowance or amount for State of Alabama or local sales and use tax payment in calculating any payments due, by application for payment, Variation or otherwise in connection with the performance of the Work and/or the provision of Seller's Equipment.

22.5 Buyer will be issued a Form STE-2 Sales and Use Tax Certificate of Exemption for the Project. Seller shall, and shall cause all of its US Sub-contractors to, submit an application for a Form STE-2 Sales and Use Tax Certificate of Exemption to the Alabama Department of Revenue, along with a written confirmation, to be provided by Buyer, stating that Seller, and/or its Sub-contractors, will be making purchases of tangible personal property to be incorporated into the Project. See Annex O to this Contract for more specific information regarding the tax abatement procedure.

22.6 In addition to any information contained in the Annexes to this Contract, Seller, and its Sub-contractors, shall have the responsibility to become knowledgeable of and adhere to the rules and regulations of the State of Alabama and Mobile County regarding the abatement of sales and use taxes and all other taxes.

22.7 Buyer is required to obtain correct taxpayer identification numbers from all noncorporate payees who receive payment for services, rents, royalties or interest that would be subject to IRS Form 1099 reporting. Twenty percent (20%) back-up tax withholding will be imposed on all Form 1099 reportable payments made to Seller if Seller fails to provide a correct taxpayer identification number. In addition if applicable, Buyer shall be entitled to withhold from any payments to the Seller such taxes as may be required by the applicable law, including, without limitation, withholding tax on income and royalties. Upon the Seller's request, the Buyer shall furnish evidence of payment of such withholding taxes to the Seller. The Buyer has the right to withhold payments for any deliveries/services performed in the United States until the original tax receipts for such payments have been presented by the Seller to the Buyer.

22.8 Seller shall defend, indemnify and hold Buyer harmless from and against all liability for all duties, sales, use and other taxes and charges which are imposed on or with respect to, or are measured by, the amounts expended by Seller for the Work furnished hereunder, and the wages, salaries, and other remunerations paid to persons employed in connection with performance of the Work.

22.9 Seller shall make itself aware of the requirements of new Chapter 40-18-73A of Title 40 of the Code of Alabama (1975) entitled the "Provisional Employer Withholding Act." To the extent applicable, Seller and its Sub-contractors shall comply in all manners with the provisions of said Act. Failure by Seller and its Sub-contractors to provide Buyer with Notice of Compliance issued by the Alabama Department of Revenue will result in ten percent of the Contract Price to be escrowed by Buyer for payment of taxes due to the State of Alabama.

A company of ThyssenKrupp Stainless **ThyssenKrupp Stainless USA**

22.10 Upon Buyer's request, Seller shall provide any and all tax related documents and forms which are required by any Law to be obtained from the Seller in connection with any payments made pursuant to the Contract.

SVAI MS Supply Contract- Final Page 63

SIE_OTK_PAPER_0000063

## 23 APPLICABLE LAW AND ARBITRATION

23.1 All disputes arising between both Parties in connection with or in the performances of the Contract shall be settled through friendly consultation between both Parties. In case no agreement can be reached through consultation after a maximum period of 30 days or as soon as one of the Parties involved requests the arbitration tribunal the dispute shall be considered as failed and any such dispute shall be submitted to arbitration for settlement.

23.2 The arbitration shall take place in Düsseldorf, Germany unless otherwise agreed to by the Parties, and shall be conducted in accordance with the Rules of Arbitration and Conciliation of the International Chamber of Commerce, Paris, (ICC Rules) in the English language by three arbitrators appointed in accordance with said rules.

23.3 The award given by arbitration shall be given in writing and be final and binding and both Parties shall abide by such award.

23.4 Any costs and charges of arbitration shall be bome by the losing Party, except as otherwise decided by the arbitration.

23.5 The substantive law of Federal Republic of Germany shall apply under exclusion of the UN Convention of Contracts for the International Sale of Goods.

23.6 In the course of arbitration the Contract shall be executed continuously by both Parties except for those claims under arbitration.

**24 FORCE MAJEURE**

24.1 Neither the Buyer nor Seller shall be held liable for non-fulfillment of their obligations under the Contract if it is due to war (whether declared or not), hostilities, revolution, civil disturbances, riots, strikes, or due to any law, order, regulation or ordinance of any competent authority, act of God or similar causes beyond the control of both parties (but does not include lock-out, shortage of labor, lack of or inability to obtain raw materials, fuel or supplies, unless caused solely by priorities, restrictions or allocations imposed by governmental authority). The foregoing shall not be considered a waiver of either Party's obligations under Contract.

24.2 Each of the Parties shall make every reasonable effort to shorten the delay arising from Force Majeure. Upon cessation or removal of such events of Force Majeure, both Parties shall promptly continue their respective obligations hereunder.

24.3 If an event of Force Majeure prevents either Party from carrying out its obligations under the Contract, the Party affected shall, within ten (10) working days of the date on which the Party affected becomes aware of the event, notify the other Party thereof.

24.4 If the Force Majeure situation continues for less than thirty (30) days , the Party affected as above shall be entitled to an adequate extension of time for fulfilling its obligations and the other Party shall not claim in respect of loss incurred by reason of Force Majeure.

24.5 If, after thirty (30) days from the date of giving the aforesaid notice, the notifying Party is still prevented, for reasons beyond its control, from performing its obligations under Contract, the Parties shall consult one another with a view to determining what action is appropriate under the circumstances.

24.6 If, after one hundred and eighty (180) days from the date of giving of the aforesaid notice, the notifying Party is still prevented, for reasons beyond its control, from continuing to perform its obligations under Contract, then either Party shall be entitled to terminate the Contract under the provisions of the Contract.

24.7 In the event of termination of Contract for Force Majeure the Buyer shall pay the Seller for all Work executed and in progress or respectively Seller shall pay the Buyer all amounts of payments effected to Seller for Work not performed prior to the date of termination at the rate and prices provided in Contract or on a pro-rata basis if not so provided and, in addition, the amount of any costs properly incurred by the Seller arising out of or in connection with such termination. Such payment shall be made to within sixty (60) days after the agreement on the respective amounts has been reached.

24.8 In the event of termination, and upon payment pursuant to Section 24.7 the Seller shall immediately assign to the Buyer, or to the extent required and paid for by the Buyer, all Work done and rights and title held by Seller relating to such work done prior to termination of the Contract.

## 25 NOTICES

25.1 Any notice to be given to the Buyer or to the Engineer under the Contract shall be served by sending the same by mail, fax or email to, or by leaving the same at the legal addresses nominated for that purpose mentioned in this Contract.

25.2 All certificates, notices or decisions instructions and orders to be given by the Engineer or the Buyer under the Contract will be served by sending the same by regular mail, fax or email to, or by leaving the same at the Seller's principal place of business or the legal address given in this Contract, or such other address as the Seller shall nominate for that purpose.

25.3 Any notice sent by fax or email transmission shall be deemed to have been served at the time of transmission. A notice sent by regular mail shall be deemed to have been served four days after posting.

25.4 Wherever in this Contract provision is made for the giving of notice or consent by any person, unless otherwise specified such notice or consent shall be in writing and the word 'notify' shall be construed accordingly. Unless specifically so stated any consent required of a party or the Engineer shall not be unreasonably withheld.

## 26. TERMINATION FOR CONVENIENCE

26.1 At any time for any reason, the Buyer may terminate by written notice any part, or the whole, of the work under the Contract. Upon receipt of a notification by the Seller, this Contract or the part concerned shall be terminated automatically.

In case of such termination,

a) the Seller shall discontinue all work under progress;

b) the Seller is obliged to inform the Buyer without undue delay in writing regarding incurred expenses as per 26.2 below;

c) Seller's above-mentioned expenses are to be offset against the payments already made under the Contract. If such payments exceed such expenses, the difference thereof, if any, shall be paid immediately to the Buyer against return of the contract related Guarantee(s), as the case may be, to the Seller;

d) comply with any directions by the Engineer, including, without limitation and to the extent directed to:

i. protect property in the possession of the Seller in which the Buyer has or may acquire an interest;

ii. demobilize from the Construction Site persons, constructional plant, vehicles, equipment etc;

26.2 Subject to the Buyer's rights under or in connection with the Contract, including without limitation the rights to withhold or set-off payment and recovery of contractual damages, the Buyer shall pay the Seller:

a) expenses and work such as engineering and design work executed prior to the date of termination;

b) costs such as commissions for bank guarantees, bank fees and charges, etc. insurance premiums;

c) the Cost of the Work ordered and/or executed by the Seller under the Contract, which the Seller is legally liable to accept. Property of such material shall be transferred to the Buyer upon payment;

d) security and retention;

e) reasonable costs of demobilization;

f) the reasonable costs of complying with any directions given by the Engineer upon or subsequent to termination.

26.3 The Buyer shall not be liable to the Seller for any cost, loss, expense or damage incurred by the Seller as a consequence of, or in connection with, the Contract, the work under the Contract or a termination under this Article, except those stipulated in Article 26.2.

26.4 In case of any termination of the Contract, whether for convenience or otherwise, the confidentiality and restriction of use obligations of this Contract and limitations of liability shall continue to apply according to the relevant provisions of this Contract.

## 27. VARIATIONS

27.1 The Seller shall not vary the work under the Contract except as directed in writing by the Engineer.

27.2 The Engineer may during the execution of the Contract direct the Seller in writing to do one or more of the following:

a) Change the engineering;

b) Change the Contract's requirements to be satisfied by the engineering, documentation, work under the Contract, or the Works;

c) Increase, decrease or omit any part of the work under the Contract;

d) Change the character or quality of any material or work;

e) Change the levels, lines, positions or dimensions of any part of the work under the Contract;

f) Execute additional work;

g) Demolish or remove material or work no longer required by the Buyer.

27.3 No Variation shall invalidate the Contract.

27.4 If so requested in writing by the Engineer, the Seller shall forthwith, and within a reasonable time, advise the Engineer in writing of:

a) The effect which the Seller anticipates that a proposed variation will have on the Contract Program or the date for a key event;

b) The Seller's estimate of the value of any variation to the Contract Price including itemized prices.

27.5 If the Seller requests the Engineer to approve a variation for the convenience of the Seller, the Engineer may do so in writing. The Engineer shall not be obliged to approve a variation for the convenience of the Seller. The Engineer's approval may be conditional and may include, without limitation, a condition that the Seller shall not be entitled to an extension of time or extra remuneration in respect of the variation or anything in connection with the variation which would not have arisen had the variation not been approved.

27.6 The amount to be added to or deducted from the Contract Price shall, if not the subject of a quotation from the Seller, which has been accepted by the Buyer prior to the Variation having been confirmed, be determined in accordance with the rates specified in ANNEX A1. Where rates are not contained in the said schedules or are not applicable in the opinion of the Engineer, then both Parties may agree upon the amount based on the reasonable quotation of the Seller and the reasonable opinion of the Engineer.

27.7 NOT USED

27.8 The Seller shall upon Engineer's request proceed with a Variations of single orders up to ten thousand (10.000) USD each and accumulated

 up to one hundred thousand (100.000) USD prior to the determination of the value thereof. In such event the Seller shall keep contemporary records of the cost of making the Variation and of time expended thereon. Such records shall be open to inspection by the Engineer and may be used to make a final determination of the value of the Variation.

27.9 When confirming in writing any variation, the Engineer shall give the Seller such notice as will enable him to make his arrangements accordingly.

27.10 In cases where Seller's Equipment which is the object of the Variation is already manufactured, or in the course of manufacture, and any work or drawings or patterns made require alteration due to the Variation, the Seller shall be paid the cost of such alterations.

27.11 The Engineer may direct that Variations on site under Article 27.2 shall be carried out as day work.

a) The Seller shall record and submit to the Engineer each day particulars of the resources used by the Seller for the execution of the day work.

b) The day work records shall be in a form to the satisfaction of the Engineer and without limitation details of the labor, material, and other things used to carry out the day work and timesheets, receipts and other documents evidencing the cost of the day work.

27.12 Any Variation that results in an increase to the Contract Price will be paid for directly by the Buyer in accordance with the payment terms described in Article 6.

27.13 If, in the opinion of the Seller, any such Variation is likely to prevent or prejudice him from or in fulfilling any of his obligations under the Contract, he shall notify the Engineer thereof with full supporting details. The Engineer shall decide forthwith whether or not the Variation shall be carried out.

27.14 Until such time as the Engineer confirms in writing his instructions to vary the Contract, such instructions shall be deemed not to have been given.

**28. MISCELLANEOUS**

28.1 In the event any provision to the Contract is held to be or becomes invalid, it shall not affect the validity of the remaining provisions of the Contract. In such cases the Parties shall seek effective solutions as closely as possible approximating the invalid provision(s) in economic effect.

28.2 The Parties have agreed that the scope of supply and deliveries as well as the warranties/ performances guarantees are exclusively determined as set forth in this Contract and its ANNEXES.

28.3 Should there be any conflict between the terms and conditions contained in the sections forming this Contract the order of precedence shall be:

- 1st Contract ; then,
- 2nd Annex A 1 Prices; then,
- 3rd Annex A 2 Contract Schedules; then,
- 4th Annex A 3 Additional Contract Conditions Parts 1, 2 and 3 , then,
- 5th Annex C Scope of Supply; then,
- 6th Annex B Technical Specification; then,
- 7th Annex E Stainless Steel Products Specification; then,
- 8th Annex J Technical Documentation Specification; then,
- 9th Annex D Standard Specifications; then,

28.4 Should any discrepancies be found between the contents of the ANNEXES and the provisions of the Contract it shall be immediately brought to the attention of the Engineer.

28.5 All correspondence documents and software shall be in the English language if not otherwise stated in this Contract. All markings, signs and labels on operator desks and stations shall be in English language.

28.6 Seller warrants and represents that neither Seller nor its Sub-contractors will utilize child, slave, prisoner or any other form of forced or involuntary labor for the performance of the Work. At Buyer's request, Seller shall certify in writing its compliance with this provision.

28.7 Seller warrants and represents that neither Seller nor its Sub-contractors are engaged in any transactions with, and/or the provision of resources and support to, individuals and organizations associated with, receiving any type of training for, or engaged in, any act or offence described in Article 2, Sections 1,3,4 and 5 of the International Convention for the Suppression of the Financing of Terrorism, adopted by the General Assembly of the United Nations in Resolution 54/109 of 9 December 1999.

28.8 Seller and Buyer represent and warrant that none of its representatives have received from or will offer to the other Party any direct or indirect benefit arising from this Contract or the award thereof.

28.9 Seller shall not create or do anything which would result in the creation of any lien, encumbrance, right of retention or any other kind of security with respect to Seller´s Equipment or any part thereof. Seller shall obligate the Sub-contractors accordingly.

28.10 The Parties declare that this Contract constitutes the whole and complete agreement concerning the deliveries and services described herein and that there no other oral or written provisions dealing with the same matter.

28.11 In case safe working conditions are not assured, the affected Party is entitled to refuse to work in such unsafe environment.

28.12 The Buyer shall grant the Seller and its potential customers access to the plants at all reasonable times with two weeks advance notice, including the visitor's name, title and company, provided the Seller will not cause interference with the Buyer's operation. In the event the time proposed by the Seller for such visit interferes with the Buyer's operation, the Buyer shall propose an alternative time for the visit, which shall not be later than thirty days after the originally proposed date.

## 29. EFFECTIVENESS OF THE CONTRACT

29.1 The Contract is made in the English Language in two (2) originals, one (1) for each Party.

29.2 NOT USED

29.3 NOT USED

29.4 NOT USED

29.5 This Contract shall become effective and binding upon the Parties at the date of its signature by both Parties and the receipt of Letter of Comfort as per Annex K 5 by the Seller.

29.6 The Seller shall commence the Work upon the Effective Date, which date shall be the starting date for the Contract Program.

Signed for and on behalf of:

**ThyssenKrupp Stainless USA LLC**

**(The BUYER)**

by duly authorized persons:

Name: Ulrich Albrecht-Früh

(Chief Executive Officer)

Name: Michael Lutter

(Vice President and Chief Financial Officer)

Signed for and on behalf of:

**Siemens Energy & Automation, Inc.**

**(The SELLER)**

by a duly authorized person:

Name: Dave Blunden

(Vice President)

Name: Mike Davin

(President and CEO Siemens VAI Services LLC)